(No. 31694.

ARTHUR L. SCHWARTZ, Trustee, Chicago, Aurora & Elgin Railroad Company, Appellee, *vs.* ILLINOIS COMMERCE COMMISSION and LEYDEN MOTOR COACH COMPANY, Appellants.

*Opinion filed March 22, 1951—Rehearing denied May 21, 1951.*

IVAN A. ELLIOTT, Attorney General, of Springfield, (WILLIAM R. MING, JR., MILTON MALLIN, and JORDAN JAY HILLMAN, of counsel,) for appellant Illinois Commerce Commission; DAVID AXELROD, (AXELROD, GOODMAN

& STEINER, and HARRY R. BOOTH, of counsel,) all of Chicago, for appellant Leyden Motor Coach Company.

LITTLE, WILSON & CLAUSEN, (MERRITT J. LITTLE, WILLIAM C. CLAUSEN, and GEORGE W. PRESBREY, of counsel,) all of Aurora, for appellee.

Mr. JUSTICE GUNN delivered the opinion of the court:

This case arises out of the application of Leyden Motor Coach Company, hereafter referred to as petitioner, for a certificate of convenience and necessity to operate a bus line along certain streets in the city of Elmhurst, village of Villa Park, and to certain point in the village of Lombard. A number of hearings were had before the commission, where objections were made to the granting of the certificate by the Chicago, Aurora and Elgin Railroad Company. The commission made findings of fact and ordered that a certificate of convenience and necessity issue to petitioner, and upon appeal to the circuit court of Du Page County the order of the commission was set aside, and hence the appeal to this court.

The three municipalities mentioned are adjacent to and contiguous to each other, Lombard being the most westerly, and Elmhurst the most easterly, and are described as being a community of about 25,000 persons, with about 17,000 in Elmhurst, 8,000 in Villa Park and 1,000 in that part of Lombard proposed to be served. The application included some north and south operations as well as the one running principally east and west, designated as route 3, and it is this proposed route 3 which is subject to objection and the source of controversy in this case.

Running through these towns in practically an east and west direction is a street known as St. Charles Road, which is the highway over which the principal branch of route 3 was proposed to operate. In addition to the east and west line through these municipalities it proposes to run some

feeder lines several blocks to the south, and back to the main line, so as to afford access to persons living some considerable distance away.

This same territory is traversed by several railroad lines, notably the Chicago and North Western Railroad, the Illinois Central Railroad, the Chicago Great Western Railroad, and the Chicago, Aurora & Elgin Railroad, and other railroads, all leading into the city of Chicago, some twenty miles to the east. None of these railroad companies named in the petition filed any objection thereto except the Chicago, Aurora & Elgin Railroad Co., hereafter referred to as the Aurora Railroad.

At some point in or near the village of Lombard the Aurora Railroad crosses the St. Charles Road, running in an angling and southeasterly direction, and by the time it has reached the proposed eastern terminus of petitioner it runs some quarter of a mile or more to the south of the proposed route, and continues on to its depot in Chicago. The Chicago Great Western operates parallel with or on the same right of way or one adjacent to that of the Aurora Railroad. The Chicago and North Western operates a railroad some half mile to the north of petitioner's route 3, and the other railroads mentioned intersect this territory. The only party appearing to object to the granting of the certificate was the Aurora Railroad, which confined itself to a cross-examination of petitioner's witnesses, and showing the general character of the transportation furnished between these municipalities.

The commission made numerous findings. It described the localities; it found that a large community high school that served not only Elmhurst but Villa Park and parts of Lombard, was located on the north side of the St. Charles Road, the proposed route 3 of petitioner; that 1600 students attend this high school, 550 of whom live in Villa Park and Lombard and the balance in Elmhurst; that there is also a Catholic and a Lutheran High School, a

hospital and a college in Elmhurst, and no direct transportation to these institutions for persons residing in Villa Park and Lombard; that north of the proposed route 3, a half mile or more away, is located the Buick Aircraft Engine Plant, which employs approximately 10,000 workers, and the Douglas Aircraft Plant employing that many more; and also to the west side of Elmhurst is a new addition in which some 400 persons reside, all of whom are a considerable distance from transportation, but who will be convenienced by the feeder lines of petitioner, not objected to.

The evidence shows that these three communities are a single community, extending its boundaries to a considerable extent in all directions; that the better stores and places of business are in Elmhurst; the people must walk from a quarter to three quarters of a mile to reach the Aurora Railroad's station to obtain access to other institutions in this community center, and that the Aurora Railroad has not the facilities nor the stations to render the service, nor is it close enough to the homes to enable householders to obtain transportation without walking unreasonable distances to reach it. All of these matters were covered by voluminous proof and extensive findings by the commission.

The Aurora Railroad confined itself to cross-examining witnesses, to showing the general amount of its business, and to attempting to show that the community was already adequately served by existing transportation lines. The above facts are adequately sustained by the finding of the commission. Among the specific findings were the following: "That the local service now rendered by respondent Chicago, Aurora and Elgin Railroad to the residents of the area involved herein is wholly inadequate; that respondent Chicago, Aurora and Elgin Railroad has not proposed to offer the type and character of service which the Commission finds that public convenience and necessity require for the residents of Elmhurst, Villa Park and immediately con-

tiguous territory; that the respondent Chicago, Aurora and Elgin Railroad is not ready, willing and able to perform the service which the Commission finds that public convenience and necessity require in and to the territory involved herein."

Another specific finding was made by the commission that the petitioner had the "necessary facilities, organization, experience and financial resources to enable it to furnish the necessary service to the public in connection with the proposed operation;" and that public convenience and necessity required the institution of the proposed motorbus transportation service, and that petitioner should be granted a certificate of public convenience and necessity.

On appeal to the circuit court the order was reversed and set aside on the ground the order and finding of the commission was contrary to the law, and was without substantial foundation in the evidence. The appellants take the position that the evidence was ample; the findings clear and specific, and that the objections of the Aurora Railroad were ill-founded.

There is nothing in the order of the circuit court to disclose upon what ground the order of the commission was set aside, but when we turn to the brief of appellee it is disclosed there were two reasons urged: (1) That the publication of the notice of the proposed hearing did not comply with the commission's rules; and (2) that the Aurora Railroad was the first in the field of serving this community, and that therefore it was entitled to remain without competition if in appellee's judgment the service was adequate and sufficient.

Appellee relies upon rule 6 of the commission to support the point that proper notice was not published. This rule provides that immediately after the filing of an application with the commission the petitioner shall cause notice to be published at least 15 days prior to the date of the hearing

upon the application. The first hearing on February 25, 1941, was not in compliance with the rule, but a new publication was made on March 11, 1941, which complied with the rule, and the first hearing thereafter that affected the application of the petitioner was May 26, 1941. The only evidence that had been heard at the first hearing was the statement of attorneys from the village of Villa Park, but after the legal notice had been published the evidence or statements taken upon the first hearing were reoffered in evidence. The Aurora Railroad was present at the first hearing, and at all subsequent hearings, and participated in all of the hearings thereafter.

Appellee seems to urge that a question of jurisdiction is involved, but jurisdictional requirements are contained in the statute, which does not make the rules announced by the commission jurisdictional. The case of *Lambdin* v. *Commerce Com.* 352 Illl. 104, is not decisive of the point in question, where there was a plain omission to follow the mandates of the statute. Since the objection is one governed by a rule which the commission may enforce or waive, and the Aurora Company was at all times present, and has not been injured in any respect, we are of the view that the point is entirely without merit.

The main controversy grows out of the alleged priority in the field of the Aurora Railroad, consequently entitling it to a preference in the transportation of passengers in this particular community. It will be observed that the finding of the commission is that the service in the community is inadequate, and that the Aurora Railroad is not ready to perform the service, and has not proposed or offered to furnish any different type of service. The attitude of the Aurora Railroad in this respect is disclosed from the testimony of the vice-president and executive in charge of operations of the receiver. His position is stated this way: "I don't think this service would feed any pas-

sengers to the Aurora & Elgin, except on a rainy or bad, snowy day. * * * If they are not passengers that we have not got now, they are of no value to us whatever. As I stated, if somebody gets on your bus on account of its being a bad day or rainy or something of that kind and rides to our station that has always been our customer, then the Leyden service is of no benefit to us whatever." When the following question was put to him: "Isn't it the fact that this territory was built up and isn't it a fact that there are considerable portions of the community that are not served and where there is a need for service which is not in competition?" he answered: "No, I don't recognize that there is any need at all." Q. "Well, then, you think that the main transportation service here should exclude any other services which are necessary?" A. "I certainly do as far as these people are concerned out there. I think it should exclude anything that would in any way interfere with the possibility of their main transportation service continuing to give service." In other words the position of the Aurora Railroad is that the people had all of the service in the way of transportation that was necessary, and if any further transportation was offered by others that would injure the Aurora Railroad it should be denied a certificate.

The position of appellee as being first in the field of transportation in that community is not thoroughly established, as the record does not disclose any more than that the Aurora Railroad was operating before the petitioner entered the field, but the record also shows that the Chicago Great Western Railroad covered almost the identical course and route as that of the Aurora Railroad, and there is nothing to indicate which of the two was in operation first. Likewise, the Chicago and North Western Railroad operates in the same general direction through Villa Park and Elmhurst, some blocks to the north, and there is nothing to show as between it and appellee which had the priority

in the field; yet, the timetables of these two railroads are offered in evidence by appellee as tending to show that the service in that community was sufficient.

We believe that appellee is laboring under the wrong impression with respect to the rule applicable to the first utility in the field. One of the first cases in which the rule was established is that of *Chicago Motor Bus Co.* v. *Chicago Stage Co.* 287 Ill. 320. In that particular case the controversy arose between two bus lines, one already in the field, and a new one applying for a certificate, and under the circumstances the court made the following comment: "It seems obvious to us that in view of the fact that appellant had been so long in the field, had spent large sums of money in securing the right to operate and in developing its business, as against the Chicago Stage Company, which had just come into existence and had spent no money in the enterprise, the former should in all justice be entitled to the preference *unless the public interests would be best served by the latter company. Mere priority in time of application would not, of itself,* govern the granting of the certificate but is an element to be considered, in connection with all other elements and facts, in determining the reasonableness of the action of the commissioners. In other words, if it appeared that appellant had for months served the public efficiently and satisfactorily on the north side and that it was able to do so on the south side, to deny it a certificate and award it to the Chicago Stage Company would seem to be so arbitrary as to be unreasonable." This is one of the first cases in which the rights of the prior occupant in the field of transportation is discussed, but the question has been before this court on several occasions since that time.

Appellee appears to believe that priority in the field, (assuming that it has been,) is sufficient in itself to prevent a certificate of convenience and necessity from being awarded to any competitor. We do not believe that the

court has ever so held. It is true that in *Egyptian Transportation System, Inc.,* v. *Louisville and Nashville Railroad Co.* 321 Ill. 580, we referred to the method of regulation of public utilities under the present statute as being upon the theory of a regulated monopoly rather than controlled competition, but when all of the cases upon the subject are examined it will be ascertained that this principle applies only where the utility first in the field is able to adequately supply the transportation needs of the community, and it appears that it is only in such cases that the rule has been applied.

Thus, in *West Suburban Transportation Co.* v. *Chicago and West Towns Railway Co.* 309 Ill. 87, where a like controversy arose, we said: "If the transportation facilities furnished by appellee are *so inadequate as to subject the public to inconvenience* and the operation of appellant's bus lines *would eliminate that inconvenience* the order of the commission was authorized." And in the same case we said: "To authorize the Commerce Commission to grant appellant a certificate of convenience and necessity and authority to operate its lines to serve the same public already served by an existing utility, it was required that it be shown the existing utility *was not rendering adequate and convenient service* and that the operation of the bus lines *would eliminate such inadequacy and inconvenience."*

In *Choate* v. *Commerce Com.* 309 Ill. 248, after referring to the fact the statute provides means for compelling the existing transportation company to provide adequate service, we commented: "If the existing transportation company does not comply with the commission's order, then a situation may arise where the *public convenience and necessity will require the establishment of another system.* The theory of the Public Utilities act is to provide the public with efficient service at a reasonable rate by *compelling an established carrier occupying a given field* to provide adequate service and at the same time to protect

the existing utility from ruinous competition." In *Illinois Power and Light Corp.* v. *Commerce Com.* 320 Ill. 427, on the same subject, we said: "The policy established by legislation for the regulation of public utilities is to provide the public with efficient service at a reasonable rate by *compelling an established public utility occupying a given field* to provide adequate service and at the same time to protect it from ruinous competition."

In the *Egyptian Transportation case,* referred to above, the same principle was announced, but qualified by the following statement: "The Commerce Commission, under the Public Utilities act, *has power to require additional service,* and in the absence of a showing that the public interest would be better served by granting a certificate to an entirely new and competing utility, such certificate should not be granted until it be determined whether the utility already in the field *can meet the requirements of public convenience and necessity.* The power of the State to regulate a utility carries with it the power to protect such utility against indiscriminate competition, and such power should be exercised to that end."

In *Bartonville Bus Line* v. *Eagle Motor Coach Line,* 326 Ill. 200, all of the cases referred to above were cited and analyzed, after which we commented: "The object and purpose of granting certificates of convenience and necessity for the operation of motor bus lines is to subserve the convenience and necessities of the traveling public. While priority in the field *is an element to be considered,* it will not of itself govern the granting of the certificate. [Citation] The proper consideration in a matter of this kind is which applicant, under the facts and circumstances shown by the evidence, will best serve the public interests." In *Chicago & West Towns Railways, Inc.* v. *Commerce Com.* 383 Ill. 20, we cited and followed all of these cases.

It is to be noted, however, that in the *Chicago Motor Bus Co. case,* and in the *Chicago & West Towns Railways case,*

the utility in the field offered proof of its ability and willingness to furnish the needed transportation, and with that proof in the record it was held they had complied with the rule that if they were able and willing to furnish the transportation, the priority which the law gives the one first in the field required the commission to give them the benefit of it if the necessities of the public would not be injured.

In the present case it is to be noted that the Aurora Railroad does not make any pretense of offering any different service than has been given by it heretofore; that it goes further, and says that the communities have sufficiently adequate service to warrant the rejection of any other competing utility, and, as a part of its contention that the community has sufficient service, offers proof that other railroads have scheduled trains which furnish all of the transportation needs of the three communities. In brief, the attitude of the Aurora Railroad is that no further transportation facilities are necessary, and that the present system is sufficient. No offer of improving the service in any way, or of furnishing means for the different members of this community to reach churches, schools, business, and working places is made, and inferentially, at least, there is some question as to its ability to so improve the service, as the operating officers contend there must be a raise in rate to conduct what is already being carried on.

The statute provides that the Commerce Commission properly may determine from the evidence whether the community is in need of improved facilities for transportation. (Ill. Rev. Stat. 1949, chap. 111⅔, par, 69, sec. 65; par. 60, sec. 56.) It has made findings in the present instance not only that the community is in need of improved transportation, but that the service furnished by the Aurora Railroad is wholly inadequate; and, in addition, that the Aurora Railroad is not willing or able to perform the service necessary for the public convenience and necessity in the

territory. There is substantial evidence in the record to sustain the finding of the commission that the service rendered this community is not adequate or sufficient, and that the service rendered by the Aurora Railroad is not adequate or sufficient.

Whether regarded as regulated monopoly or controlled competition, the principle emerges from an examination of all these cases that where a public utility first in the field is serving a community, and a finding is made by the commission that the service rendered by such utility is inadequate or insufficient, and there is a finding that the community is entitled to improved service, the utility first in the field may be compelled to render adequate and sufficient service, or, in case it fails, refuses, or is unable to render such adequate service, the commission has the power to award a certificate of convenience and necessity to another competing public utility, able and willing to adequately serve the needs of the community. A fair examination of all of our decisions upon the question establishes, and none are opposed to, the principle that protects a utility that fulfills its obligations to the public, or, when the utility first in the field has failed in its public obligations, permits a competing utility to render adequate service, to such community.

The question may arise upon whom lies the burden of showing the ability of the utility in the field to render the service that the community may require. If the service is inadequate and the utility in the field desires to furnish such additional service it should show, or offer to show, its ability to do so. The Aurora Railroad does not state whether or not it has the ability, but says there is no necessity for rendering the service. In this they disagree with the commission, and in that respect we are obliged to follow the finding of the commission where there is evidence to sustain it. There is ample evidence in this record to sustain the contention that these communities do need more

adequate transportation, and the fact that the Aurora Railroad believes it has sufficient is not the test. While it is true that the transportation furnished by the petitioner is by bus, and that by the Aurora Railroad is by train, there is no rule of law that prohibits the Aurora Railroad from furnishing the same localized service by bus as does the petitioner.

As a matter of fact, when we view the situation of these three communities, some miles in extent east and west, and with schools, factories, churches and places of business enterprises throughout this distance located for a considerable distance north and south, it seems apparent that additional transportation that would carry children to their schools and individuals to their churches, and workmen to their places of employment, would certainly be a convenience of which they should not be deprived, unless the rules of law require that it be done.

One of the chief reasons urged by appellee for denying the petition is the financial burden it would place upon it, but this is no reason why they should be allowed to monopolize the field, if they are unable to perform what they have by implication agreed to do, that is, furnish transportation adequate to the needs of the community, as found by the Commerce Commission.

Some question has been raised by petitioner as to the sufficiency of the claim of appellee that it has a priority in the field because of the fact that it was in business many years prior to the petitioner. We are of the opinion that the evidence in the present case is insufficient for us to pass upon that question. As above pointed out, there are several railroads operating in an easterly and westerly direction through these communities, and there is no evidence to show which railroad was located first, or as to what extent they are furnishing the same type of service.

We have not yet had presented to us this question of priority where there are several in the field, and the con-

tention is made by one who happens to be prior in point of time to the petitioning party. It is sufficient for the determination of this case to hold that the findings of the Commerce Commission from the evidence show the transportation demands of the communities in question were not adequately served by appellee; that the appellee has made no offer to furnish the service found by the commission to be necessary for these needs. With the record in this condition, appellee is in no position to claim the privileges awarded to the one first in the field, because, as pointed out in the cases cited, this privilege is based upon the assumption that it is ready and willing and able to fill whatever transportation needs the commission may find is necessary or adequate for the community it serves.

For the foregoing reasons, the order of the circuit court of Du Page County is reversed and the order of the Illinois Commerce Commission confirmed.

*Circuit court reversed;*
*Commerce Commission confirmed.*

Mr. JUSTICE FULTON, dissenting.