(No. 32266.—

CHICAGO, ROCK ISLAND AND PACIFIC RAILROAD COMPANY *et al.,* Appellees, *vs.* ILLINOIS COMMERCE COMMISSION *ex rel.* Illinois Central Railroad Company *et al.,* Appellants.

*Opinion filed January 22, 1953—Rehearing denied March 24, 1953.*

Ivan A. Elliott, Attorney General, of Springfield, (Milton Mallin, and Wilbur S. Legg, of counsel,) for appellant Illinois Commerce Commission; Erle J. Zoll, Jr., Howard D. Koontz, and John W. Foster, all of Chicago, (J. H. Wright, C. A. Helsell, J. W. Freels, and H. J. Deany, of counsel,) for appellants Illinois Central Railroad Company *et al.*

W. F. Peter, Bruce Dwinell, and Kirkland, Fleming, Green, Martin & Ellis, all of Chicago, (Joseph B. Fleming, and John L. Bordes, of counsel,) for appellees.

Mr. Justice Fulton delivered the opinion of the court:

This is an appeal seeking review of an order of the circuit court of Cook County, entered on July 26, 1951, reversing a decision and order of the Illinois Commerce Commission of February 28, 1950, and later amended on March 28, 1950. The commission's order authorized the Illinois Central Railroad Company, hereinafter called appellant, and its subsidiary, the Kensington & Eastern Railroad Company, hereinafter called Kensington, to construct a spur track at grade from a point on the main line of the Kensington across the tracks of the Pullman Railroad Company, hereinafter called appellee, and a public highway known as Doty Avenue to a point in the Lake Calumet harbor area in the city of Chicago.

A joint application was filed on March 20, 1947, with the Commerce Commission by the appellant and the Kensington seeking permission to construct the spur line in question. The appellant is a trunk-line railroad operating in fourteen States and the Kensington is its wholly owned subsidiary operated from point of connection on the appellant railroad in the city of Chicago to a point on the Illinois-Indiana State line. The appellant's line of railroad is adja-

cent to and parallel to the Lake Calumet harbor area to the north and along the westerly side thereof, and the Kensington is adjacent to and parallel with the Lake Calumet harbor area on the west and on the south. The Kensington presently has no spur, industrial, team, switching or sidetrack into the harbor area. The application prayed a certificate of convenience and necessity authorizing the construction, maintenance and operation of a spur track crossing appellee's track and the public highway into the Lake Calumet harbor area. The appellee filed an answer to the application denying that the two roads were adjacent to Lake Calumet and that for either of them to make service available to the harbor area it would be necessary for them to construct a spur into the Lake Calumet harbor area. It denied that public convenience and necessity required the construction of such a spur and affirmatively argued that such construction by the appellants would constitute an extension of line within the meaning of section I(18) of the Interstate Commerce Act, which is a matter exclusively within the jurisdiction of the Interstate Commerce Commission. Subsequent thereto the commission granted leave to the Chicago, Rock Island and Pacific Railroad Company to intervene on the ground that it had filed a petition with the Interstate Commerce Commission to acquire control of Pullman and accordingly became a party in interest. Inasmuch as no question has been raised as to the propriety of the Rock Island appearing in this proceeding nor any denial that it had acquired the rights of Pullman by reason of its acquisition of Pullman it will be grouped with Pullman in this cause and referred to as appellee.

The evidence in the case, together with the exhibits, is somewhat lengthy. Reducing it to the minimum essentials, it appears that the Pullman Railroad Company, appellee here, has a line which interposes itself between the Lake Calumet harbor area and the appellant and Kensington.

The mouth of the Calumet River, which empties into Lake Michigan, is located at approximately Ninetieth Street on the south side of the city of Chicago. The proposed Lake Calumet harbor development begins at approximately 110th Street and extends south to approximately 130th Street. From 95th Street to a point just south of 119th Street, the Pullman railroad lines lie a considerable distance east of the Illinois Central and the Kensington, and between those lines and the harbor area. At a point just south of 119th Street, the Kensington and the Pullman are immediately adjacent to each other in a southeasterly direction. At 127th Street the line of the Pullman railroad swings to the east and into the Calumet harbor area. The line of the Kensington also swings to the east but is again south of the Pullman tracks.

Chronologically, the predecessor of Pullman, the Pullman Palace Car Railroad Company, came into being in 1880. In 1904 the appellant, through Kensington, began, and in 1909 completed, construction of a line of road eastward to the Illinois-Indiana State line. In 1906 Pullman was incorporated. Its predecessor, Pullman Palace Car Railroad Company was constructed in 1880. Between 1877 and 1880 Pullman interests purchased nearly 4000 acres of land between 87th Street on the north and 138th Street on the south, extending from the Illinois Central tracks to the western shores of Lake Calumet. Three thousand acres have been sold, of which 1000 acres are now occupied by industries. In 1909 Pullman extended its service to 126th Street. In this vicinity in 1909 were two industries, the Knickerbocker Ice Company and Swift & Company, both of which were east of the railroads. At that time Pullman, as well as Kensington, served the Knickerbocker ice house, while Kensington alone served the Swift plant. In 1915 Pullman extended its line and also began serving the Swift company. Kensington then removed its spur facilities in

the area due to poor revenues, and thereafter the Pullman continued to serve both Swift and Knickerbocker until 1934.

In 1916 Pullman extended its line to the south and as far as 130th Street, thence around the southerly end of Lake Calumet in an easterly direction to the Calumet River. It appears that from 1934 to the present time no industry other than the United States Navy Warehouse has been in the Calumet harbor area and this industry has been served by Pullman. This warehouse is at the southerly end of Lake Calumet.

In 1913 the Illinois legislature granted the city of Chicago power and authority to own and operate a harbor and the necessary facilties in connection therewith. In 1921 the legislature granted Chicago all right, title and interest to the bed of Lake Calumet except the part falling within the limits of the harbor in accordance with the plan of the city. The evidence on behalf of Pullman indicates that the extension of the road to the Navy warehouse area was part of a plan to encircle the entire harbor area when so notified by the city of Chicago in accordance with the harbor plan. At that time agreements were executed between the city of Chicago and the Pullman interests whereby these interests waived their riparian rights to four miles of lake front, including that part upon which the appellant proposes to build its tracks. It appears that after the extension of the line in 1916, rail service, such as it was, to and from the territory, has been performed exclusively by Pullman or its successor in interest.

In 1943 the Illinois Central made a survey indicating that the primary requisite for the establishment of additional industry was the making available the services of a strong trunk-line carrier to the harbor area. After making a survey, the Illinois Central obtained commitments of two interests to locate in the harbor area. Since that time the Illinois Central has made various moves designed to further the building up of the area in question.

It is admitted that the proposed spur of the appellant, to reach the Calumet area, would necessarily have to cross the right of way of Pullman and also cross Doty avenue, a public highway, east and parallel to both the Kensington and Pullman. It is further admitted that the construction of this particular spur or any other spur could and would provide a direct service to the harbor facilities for coal shipments which primarily originate on the Illinois Central. At the present time Pullman has authority for two spurs, one across Doty Avenue at 107th Street and one across Doty Avenue at 129th Street to serve interests in the area.

It appears that the Pullman-Rock Island is presently serving 21 industries in the territory adjacent to the proposed Lake Calumet harbor area. These industries occupy 1000 acres and are served by nearly 300 miles of track. It further appears that during the year 1946 Pullman handled 50,000 cars from and to its industries. It further appears that from 95th Street to 130th Street at the present time no railroad other than Pullman has any trackage whatsoever in the territory involved here. This covers a north and south area from 95th Street to 130th Street. It also appears that neither the appellant nor the Kensington serves any industry in the area from 95th to 130th streets between the line of railroads on the west and Lake Calumet and the Calumet River on the east. There was no industry on the rails of the Kensington.

On this record the commission found that there are extensive plans for the industrial development of the south Lake Calumet area; that one of the most important aspects of the plan development would be a terminal facility for transferring coal from railroad cars to ships; that existing coal transfer facilities and rail service afforded this area were inadequate; that the public would derive definite advantages and benefit if the proposed harbor area were served by the Illinois Central; that public convenience and necessity require the construction of the proposed spur;

and that public safety required a grade separation between the proposed spur and the public highway which it would cross. Authorization was then given the Kensington and the Illinois Central to construct a spur at a later date.

The appellees argue that the Illinois Commerce Commission exceeded its jurisdiction in that the track in question, under the law, is an extension of the line of the Illinois Central and not a spur track and that in such cases the Interstate Commerce Commission has exclusive jurisdiction to authorize the construction. (*Texas and Pacific Railway* v. *Gulf, Colo. & Santa Fe Railway Co.* 270 U.S. 266.) They further suggest to this court that the findings of the commission are insufficient to support its conclusions, citing *Dixon* v. *Pitcairn,* 362 Ill. 213, and further pointing out that present, not future, public convenience and necessity is required in any determination by the commission. (*Southern Pacific* v. *Western Pacific,* 61 Fed. 2d 732.) The last allegation by the appellee, of any importance, is that public convenience and necessity do not require the construction of the track sought to be constructed, inasmuch as the Pullman-Rock Island is rendering adequate service in the territory and there is no finding to the contrary, and also no finding that the Pullman-Rock Island cannot render adequate service in the future. They state, under the well-accepted principles of this State, that before the commission can authorize one railroad to build into the territory of another, it must find affirmatively that the carrier in the field is not rendering and will not render adequate service. *Gulf Transport Co.* v. *Commerce Com.* 402 Ill. 11.

Appellants cite the cases limiting the authority of the reviewing court to a consideration of whether the commission acted within the scope of its authority, whether the commission's findings support its decision, whether the findings and decisions have substantial foundation in the evidence, and whether constitutional rights have been infringed. (*Illinois Central Railroad Co.* v. *Franklin County,*

387 Ill. 301.) They argue that the proposed construction is required by public convenience and necessity, citing *Interstate Commerce Com.* v. *Parker,* 326 U.S. 60, and *Gulf Transport Co.* v. *Commerce Com.* 402 Ill. 11. They further argue that the circuit court erred in considering the adequacy or ability of other roads serving the harbor area, citing *Gulf Transport Co.* v. *Commerce Com.* 402 Ill. 11, *Bartonville Bus Line* v. *Eagle Motor Coach Line,* 326 Ill. 200, and *Schwartz* v. *Commerce Com.* 409 Ill. 182. Lastly, they urge that the circuit court erred in failing to consider all of the evidence in the cause, citing *Radio Corporation of America* v. *United States,* 342 U.S. 412.

The greater part of the argument of both the appellant and the appellee is directed at whether or not the construction of the Illinois Central is a spur or an extension of an existing line solely within the purview of the Interstate Commerce Act, and whether or not the appellant seeks to invade the territory of another carrier. The decision of both of these questions depends, to a certain extent, upon the factual situation. In *Texas & Pacific Railway* v. *Gulf, Colo. & Santa Fe Railway Co.* 270 U.S. 266, cited by both parties, the Supreme Court of the United States said, "If the purpose and effect of the new trackage is to extend substantially the line of the carrier into new territory, the proposed trackage constitutes an extension of the railroad within the meaning of paragraph 18, although the line be short and although the character of the service contemplated be commonly rendered to industries by means of spurs or industrial tracks. Being an extension it cannot be built unless the Federal Commission issues its certificate that public necessity and convenience require its construction."

In *Gulf Transport Co.* v. *Commerce Com.* 402 Ill. 11, we had the following to say concerning invasion of utility fields: "Again, in the *West Towns case* [*Chicago & West Towns Railways, Inc.,* v. *Commerce Com.* 383 Ill. 20,] we pointed out that before the competing certificate may

be granted it must be established that the pioneer in the field was unable to adequately perform the service which may be found necessary and convenient by the commission; that the pioneer in the field cannot render any additional service to meet that proposed; that it cannot furnish the service required by public convenience and necessity. The entire order in this cause is inconsistent with the holdings in these cases."

This protective ruling is tempered somewhat by a ruling in *Bartonville Bus Line* v. *Eagle Motor Coach Line,* 326 Ill. 200, cited with approval in *Schwartz* v. *Commerce Com.* 409 Ill. 182, "While priority in the field is an element to be considered, it will not of itself govern the granting of the certificate. [Citation] The proper consideration in a matter of this kind is which applicant, under the facts and circumstances shown by the evidence, will best serve the public interests."

In arguing these points the appellant contends that under any circumstance, the permission of the Illinois Commerce Commission had first to be obtained by it before any spur track should be constructed. They point out that under the ruling in *Texas Pacific Railway Co.* v. *Gulf, C. & F. Railway Co.* 270 U.S. 266, the appellee, to test the finding of the commission, was confined to the remedy of injunction prescribed by the Interstate Commerce Act.

To the second argument as to the invasion of the territory of a competitive line, they argue first that *Gulf Transport Co.* v. *Commerce Com.* 402 Ill. 11, is inapplicable to the situation before the commission in the instant cause in that both carriers here were in the field. Further, they state, the ruling in the *Gulf Transport case* is applicable more to the bus field than to rail carriers, and it is in the cases involving bus operations where the question of invasion more often arises.

It is true, and we have so stated, that as a general rule each decision must stand on its own facts. Court decisions

serve as guides to business practices and as aids to courts in determining the rights of litigants before them. It is further true that in many instances the distinction in facts between one case and another will determine the applicability of a particular rule to the case before the court. However, there are certain classes of cases where a broader viewpoint must obtain. Cases dealing with public policy and the protection of public welfare demand some adherence to a more broad general principle than the one enunciated. An example is the basic principle behind decisions such as *Gulf Transport Co.* v. *Commerce Com.*, too often overlooked in the citation of the case on the factual grounds, that public utilities must be protected in order to enable them to better serve the public. The entire theory in this State behind decisions such as the one in *Gulf Transport Co.* v. *Commerce Com.* is that, by unbridled competition, existing carriers can be forced out of business with a resulting damage to the public.

The same principle is apparent in the Federal decisions. In *Texas & Pacific Railway Co.* v. *Gulf, C. & S. F. Railway Co.* 270 U.S. 266, cited by the appellants, the Supreme Court of the United States further said:

"But where the proposed trackage extends into territory not theretofore served by the carrier, and particularly where it extends into territory already served by another carrier, its purpose and effect are, under the new policy of Congress, of national concern. For invasion through new construction of territory adequately served by another carrier, like the establishment of excessively low rates in order to secure traffic enjoyed by another, may be inimical to the national interest. If the purpose and effect of the new trackage is to extend substantially the line of a carrier into new territory, the proposed trackage constitutes an extension of the railroad within the meaning of paragraph 18, although the line be short and although the character of the service contemplated be that commonly ren-

dered to industries by means of spurs or industrial tracks. Being an extension, it cannot be built unless the Federal Commission issues its certificate that public necessity and convenience require its construction."

With the dangers indicated by the language of both of the foregoing cases in mind we must turn to the record to determine whether or not the protective principles of our law and of the Federal law govern. It would appear that the original development of the area in question was formulated by Pullman. The Pullman interests purchased 4000 acres of land adjacent to the Lake Calumet harbor area; they constructed and maintained a spur track into the area when Kensington withdrew because of scarcity of business, and they constructed and maintain a spur serving the only industry in the immediate harbor area at the present time. Their line is more adjacent to the Lake Calumet harbor area and they, apparently, have met the demands of whatever industries have required service in the area to the present time. There are indications that there will be other interests in the area which will require the services of railroads. Pullman has indicated its willingness to construct spurs to these industries at such time as they locate in the area. The industries fringing the area are all served by Pullman. The record states that none of these industries is served either by Kensington or by the appellant. It is true that a spur constructed by the Illinois Central at the present time will not do immediate damage to Pullman. This is so only because there are no industries in the area at the immediate time which are not already served by Pullman. However, if a spur is constructed by the Illinois Central into the area and it begins to haul freight and other commodities into the area and serve such industries that may grow up along its spur, it is taking business out of the area to its own benefit. Dangers of this type of operation are immediately apparent. Carriers taking no interest in, or giving no service in, an area pio-

neered by another carrier who has taken the bitter with the sweet throughout the years, are given an opportunity on the basis of future convenience and necessity to invade the territory already served by an existing carrier and drive it out of the territory entirely. By advocating special interests here, such as the hauling of coal and the locating of specially chosen industries along the extension which it proposes to build, the Illinois Central seeks to enter the Lake Calumet harbor area in competition with the Pullman railroad which is already serving the only industry in the area. For years, and even after the Illinois Central and its wholly owned subsidiary, Kensington, had withdrawn from the area because of lack of business, Pullman continued to serve those interests which remained in the area. This, it seems to this court, is the very type of situations toward which our broad general rule disallowing competition was directed. It has been determined, under our law to protect railroads in their existence, to allow them the fruits of their labors. That they do this without competition redounds to the benefit of the public in lower rates and controlled operations. We feel that the broad general rule as enunciated in the *Gulf Transport Co. case* and all other related cases requires that we protect Pullman in this matter. If we are to allow the reasoning offered by the appellant here to overcome this rule, new territories which have been served to date by existing carriers are open to invasion by any other carrier which presently passes through the area noncompetitively. Such policy is not in accord with the previous decisions of this court.

Having reached the foregoing decision on a careful study of the entire record, we find the other arguments of the parties unnecessary to discuss. The judgment of the circuit court reversing the order of the commission is affirmed.

*Judgment affirmed.*