JERRY HALL, Plaintiff-Appellant, *v.* EUGENE LYONS *et al.*, Defendants-Appellees.

First District (5th Division)   No. 77-1493

Opinion filed April 27, 1979.

Turney and Roddy, of Chicago (Joseph V. Roddy and Joseph J. Stevens, of counsel), for appellant.

Joseph J. Kozlowski, John A. Smith, and Ralph L. Rehnquist, all of Chicago (Kozlowski & Smith, of counsel), for appellees.

Mr. JUSTICE LORENZ delivered the opinion of the court:

Plaintiff filed a complaint under the Administrative Review Act (Ill. Rev. Stat. 1977, ch. 110, par. 264 *et seq.*) for review of the decision of the Village of Oak Lawn's Board of Fire and Police Commissioners (Board) which found him guilty of violating certain rules and regulations of the Fire and Police Commission of the Village of Oak Lawn, and ordered him discharged from his position as a lieutenant and member of the Village's Fire Department. On appeal, he contends that (1) the Board lacked the jurisdiction to hear his cause, (2) its findings were against the manifest weight of the evidence, and (3) its discharge order was arbitrary.

Charges were filed against plaintiff on December 27, 1975, and amended on January 27, 1976. He was charged with violating article IV, section 140.11 of the Oak Lawn Fire and Police Commission rules, and chapter I, rules 9 and 28 of the Rules and Regulations of the Oak Lawn Fire Department, in that he (1) responded to an alarm in an intoxicated condition, (2) allowed the men under his command to drink intoxicating liquor while on duty, (3) drank intoxicating liquor whereby he could not properly perform his duty, (4) stored intoxicating liquor in the fire house, and (5) disobeyed direct orders from a superior officer. A hearing on these charges was held before the Board and the following pertinent evidence was adduced.

*Elmore J. Harker, Deputy Chief, Oak Lawn Fire Department*

He is Jerry Hall's shift commander. On December 23, 1975, Hall had been a lieutenant for five or six years, was station commander at the Marion Station Company No. 4 and was in command of Joe Gaul, Richard Champlain, John Butler, and Robert McKee. He talked to Hall a few minutes before midnight on December 23 and realized that Hall wasn't talking clearly. Hall was then at 9609 South Marion, where he was responding to a call that water was coming into the basement, and there was concern that the water would extinguish the flame of the hot water heater and cause "a gas problem." He and a Lieutenant Buckley went to the scene. Hall was in the basement, standing in water approximately eight inches deep, and lighting a cigarette. He noticed that Hall couldn't stand straight, was weaving back and forth, and could not talk properly.

He began to talk to Hall, but left the basement after observing Hall's condition. He assigned another engine crew to handle the alarm, and instructed Hall that his engine was to go to Company 3, located at 94th Place and Cook and next to a police station. He called the police station, and asked a Sergeant Banis to prepare a breathalizer test. When Hall's crew arrived at the station, he spoke to Hall in Lieutenant Buckley's presence. He asked Hall if he had been drinking that day. Hall said that he and his men had not been drinking anything. He first requested and then ordered Hall to submit to a breathalizer test, and Hall refused. After Chief Vogelsanger arrived Harker briefed him on what had happened and talked to Hall in the chief's presence. Hall again denied drinking that day, and again refused a request and a direct order to take a breathalizer test. He then relieved Hall of duty. He, Vogelsanger, Buckley and Hall drove to the Marion Station Company No. 4. Earlier that day, two bottles of wine had been given to each man at the station. Pursuant to an eight- or nine-year custom, the wine was bought by the chief with public donations, and had been delivered to the station by ambulance crew. To his knowledge, however, nobody was ever authorized to drink the wine at the station, and it was not customary to do so. He asked the men in Hall's crew to put all the wine bottles on the table. They counted all the bottles, and found that one bottle of "Cold Duck" was missing. The men said that they had drunk that bottle around dinner time. He and Captain Bulow, Hall's immediate superior, went upstairs to the sleeping quarters. Hall's locker door was wide open, and on the bottom of it was a half-empty fifth of blackberry brandy. They went back downstairs and saw that Hall was still in the station. He told Hall that he was relieved of duty and instructed him to leave. Hall began to argue that Harker couldn't tell him to leave. Harker went into the kitchen, talked to the four men there and returned. Hall was still there, and he gave Hall a direct order to leave the station. Hall refused, and said something to the effect that Harker could not make him leave. As they talked, he noticed that Hall could not talk clearly or coherently, his breath smelled like alcohol, he was rocking back and forth and his eyes were watery and out of focus. He told Hall that if he didn't leave immediately, he would call the police for a squad to come over. Hall made no effort to leave, so, after a few minutes, he began to dial the police department. As he did this, he noticed that Hall was leaving the station with Lieutenant Buckley. In his opinion, when he saw Hall at the house at 9609 South Marion, Hall was definitely not in condition to act as an officer on the Oak Lawn Fire Department.

On cross-examination he denied having any personal dislike for Hall. He conceded that he has not heard any citizen complaints about the fire department's performance on the alarm at 9609 South Marion. He admitted that he did not tell the ambulance crew that delivered the gift

bottles of wine that nobody was supposed to drink the wine while on duty or store it at the fire stations, even though he knew that those acts were against the rules. He stated that he did not know whether Hall had a drinking problem or insomnia. He acknowledged that on January 1, 1976, after speaking with Eugene Lyons, the Chairman of the Board of Fire and Police Commissioners, he served on Hall a notice which was signed by him, suspending Hall without pay pending a hearing. He acknowledged that only Mr. Lyons, as chairman of the Board of Commissioners, could have ordered such a suspension. He conceded that Hall is competent in fire-fighting techniques. He stated that as far as he was concerned, the rule against storing liquor in the fire station could be "bent" to the extent that the men could store the gift bottles of wine there overnight and take them home the next morning. He acknowledged that if the fire fighters "are out in freezing weather on a fire and somebody really gets cold or wet, I don't think it would be frowned on if he had a shot of whiskey to warm up." He further acknowledged that it was cold on the night in question. He does not know if Hall had a cold on the date in question.

### Richard Champlain

He has served under Jerry Hall's command in Company No. 4 of the Oak Lawn Fire Department since March of 1975. On December 23, 1975, he and Robert McKee were assigned to ambulance 6. They went to Company No. 1, picked up boxes containing bottles of wine, and delivered them to companies #2, 3 and 4. At the evening meal that the men had together at the station, a bottle of "Cold Duck" wine was consumed. He had a cup of the wine, but did not actually see anyone else, including Lieutenant Hall, drink any. He heard a rumor on the morning of December 23 that Chief Harker was mad at Hall because the men of Company No. 4 were putting a muffler on Robert McKee's car and Harker was not informed.

On cross-examination, he admitted that rumors are common around the station and that it was rumored that Harker and Hall didn't get along. He acknowledged that when he picked up the gift bottles of wine, Chief Harker did not give him any warnings about drinking the wine on duty or storing it at the station. He stated that he thought that all the men knew that drinking the "Cold Duck" was against the rules. He stated that he was not in any way under the influence of intoxicating liquor when the company answered the call on Marion Street, and nothing improper was done in dealing with the alarm. He noticed that Hall's speech was slurred, but did not smell Hall's breath and doesn't know if he was intoxicated. Prior to that evening he had not seen Lieutenant Hall drinking or under the influence of intoxicating liquor while on duty.

*Joe Gaul*

On December 23, 1974, he was on duty and was second in command of Company No. 4 under Lieutenant Jerry Hall. At dinner that evening the men shared one of the bottles of "Cold Duck" that had been delivered that day. He and the men, other than Lieutenant Hall, later received a one-day suspension for drinking that wine. When the call came in directing them to 9609 South Marion, he went downstairs and talked to Lieutenant Hall. He noticed that Hall's eyes were "blurry," his speech was "slurry," and he appeared to have been drinking. He told Hall, "I think you ought to stay back," but Hall insisted on going. He later agreed to take a breathalizer test, although one was not given.

On cross-examination he admitted that he was aware of rumors that shortly before December 23, Harker and Hall had "personality clashes" which had no relation to drinking on duty. Prior to the evening in question he had never seen Hall under the influence of any alcohol while on duty. He acknowledged hearing that he should have gotten more than a one-day suspension because he was second in command and because he didn't turn Hall in. He acknowledged that he did not observe Hall having any trouble walking, driving or communicating on the night in question.

*William R. Buckley*

He is a lieutenant in the Oak Lawn Fire Department. In the late evening and early morning of December 23 and 24, 1975, he and Deputy Chief Harker went to 9609 Marion, and met with Captain Bulow. He then went down to the basement and saw Jerry Hall, apparently intoxicated, standing in six to eight inches of water and swaying back and forth. When he asked Hall what he was doing, Hall just looked at him. Hall later told Deputy Chief Harker and Chief Vogelsanger that he had not had anything to drink and refused to obey Harker's order to take a breathalizer test. Harker later ordered Hall to leave the station house, but Hall did not leave. Chief Vogelsanger then said, "Buckley, get him out of the building." He said to Hall "Come on, Jerry, let me take you home." Hall left peacefully.

On cross-examination, he acknowledged that shortly before December 23, he heard of an argument between Harker and Hall about repairing cars.

*Thomas Bulow*

He is a captain in the Oak Lawn Fire Department. He substantially corroborated Deputy Chief Harker's account of the night in question. Hall's speech was slurred, he had trouble walking, and he apparently was not able to perform his duties.

*Earl Vogelsanger*

He is chief of the Oak Lawn Fire Department, and has known Jerry

Hall for approximately 10 years. He corroborated Deputy Chief Harker's account of Hall's denial of drinking and refusal to obey orders. Hall's speech was "thick," he seemed to be staggering and appeared to be "under the influence."

On cross-examination, he acknowledged that Hall is an efficient, effective and competent fire fighter, and is a good man for the fire department.

*Robert McKee and John Butler*

On December 23, 1975, they were under Jerry Hall's command. They corroborated prior testimony regarding the fire fighters sharing the "Cold Duck" and answering the alarm at the Marion address. Butler stated that although Hall looked tired and his speech was slurred, he performed his duties properly at the Marion address until he was relieved.

*Jerry Hall on his own behalf*

He has been with the Oak Lawn Fire Department for about 11 years. Over the last five years he and Deputy Chief Harker have had numerous discussions about the men working on their automobiles at the station, and on the morning of December 23, 1975, they argued about this matter. He corroborated prior accounts of he and his men drinking a bottle of "Cold Duck" wine with dinner. He did not stop this because he felt it was "good relations" and that it was not "going to hurt anybody." He has kept a bottle of blackberry brandy in his locker for over a year. He drinks the brandy on occasion to help him sleep or "sweat out" a cold, and he has never drunk more than two ounces of it during one day. He also kept a bottle of "Nyquil" in his locker, and takes that when he has a cough. On December 23, he drank a cup of "Cold Duck" at dinner, and later when he had trouble going to sleep, because of a bad cold, he had a couple of ounces of brandy and two capfulls of "Nyquil." He had approximately four hours of sleep on both the 22d and 23d of December. When Chief Harker relieved him of duty and ordered him to leave he "got very mad" and argued with him. When he realized that this wasn't doing any good, he left with Lieutenant Buckley. He refused Harker's order to take a breathalizer test because he knew that he had some "Cold Duck" earlier. Also, he was mad at being relieved of duty, and felt that Harker was "out to get" him due to their argument earlier. The only other time he had a similar problem was five years ago, when he reported for duty after drinking during the day, and subsequently received a five-day suspension. Since the 23d day of December, he has joined a course for problem drinkers which is run by a Mr. Perkins. He has also "cut way down" on his alcohol consumption. On January 1, 1976, Deputy Chief Harker handed him a letter stating that he was suspended without pay for 30 days pending a hearing, but he never received a suspension notice from the Oak Lawn Police and Fire Commission.

On cross-examination, he stated that he was not aware of having trouble speaking or walking or being intoxicated on December 23, 1975.

Following this hearing, the Board found plaintiff guilty of the charges, and ordered him discharged and removed from his position as a member of the Village of Oak Lawn Fire Department. After his post-hearing motions were denied, he filed his complaint for administrative review. The court affirmed the Board's findings and decision, and he then filed this appeal.

OPINION

Plaintiff first contends that because the Board failed to follow certain of its own procedural rules, it lacked the jurisdiction to hear his cause. He states that the order served on him on January 1, 1976, suspending him without pay pending a hearing, was signed only by Deputy Chief Harker. Plaintiff argues that although the Oak Lawn Fire and Police Commission rules authorize the chief of the fire department to suspend a member for up to five days and also authorize the Commission to suspend a member for up to 30 days pending a hearing, there is no authorization for Deputy Chief Harker to have suspended him pending his hearing. Plaintiff next alleges that the Commission's rules were again violated because he did not receive a copy of the list of witnesses and charges against him five days before the hearing was convened on January 23, 1976. He therefore concludes that the Board did not obtain jurisdiction over him, and its findings and order should be reversed.

■■ We reject this argument. Charges were first served on plaintiff on December 29, 1975. Amended specifications and a list of witnesses were also served on him on January 23, 1976, and it was agreed that any additional amended charges would be served by January 28, 1976. At the hearing on January 23, the question of proper notice to petitioner was discussed. In order to guarantee him ample opportunity to prepare his defense, the hearing was ordered continued until February 4, when evidence pertinent to this cause began to be adduced. The written charges filed in an administrative proceeding must simply apprise the accused of the charges against him with reasonable certainty (*Guzell v. Civil Service Com.* (1974), 17 Ill. App. 3d 266, 308 N.E.2d 351) so as to enable him to intelligently prepare his defense. (*Wierenga v. Board of Fire & Police Commissioners* (1976), 40 Ill. App. 3d 270, 352 N.E.2d 322.) This standard was clearly met below, and any argument that the notice given to petitioner did not sufficiently inform him of the charges is without merit.

■■ Although plaintiff argues that the suspension order served on him was defective, he has not caused that order to be included in the record

before us on appeal. A party prosecuting an appeal must furnish a record sufficient to establish error, and any doubt arising from the incompleteness of the record will be resolved against the appellant. (*Sandberg v. American Machining Co.* (1975), 31 Ill. App. 3d 449, 334 N.E.2d 246.) Since the order is not in the record before us, all recitations or statements in the order are unknown, and the question of whose authority it was issued under is clearly speculative. This is especially true in light of Deputy Chief Harker's testimony that he knew it was the chairman of the Board's province to authorize the suspension order, and that he signed and served the order only after he met with the chairman concerning that matter. Further, plaintiff has cited no cases, and we have not found any decisions, which support his argument that simply because the signature on the suspension order was improper or the written notice of charges was not timely given under the Oak Lawn Fire and Police Commission Rules, the subsequent administrative proceedings were held without jurisdiction. In *Schwartz v. Illinois Commerce Com.* (1951), 409 Ill. 182, 98 N.E.2d 766, our supreme court found that the Illinois Commerce Commission's jurisdiction was by statute, and not by certain procedural rules which the Commission announced. Accordingly, in the absence of any showing of injury, appellant's argument that noncompliance with certain rules resulted in a loss of jurisdiction was found to be without merit. (409 Ill. 182, 187, 98 N.E.2d 766, 769.) In the instant case, the Board's jurisdiction was conferred by section 10—2.1—17 of the Illinois Municipal Code (Ill. Rev. Stat. 1977, ch. 24, par. 10—2.1—17), which provides that a municipality's board of fire and police commissioners may, for cause and upon written charges, remove or discharge a member of the fire or police department after said member has had an opportunity to be heard in his own defense. Plaintiff does not contend that this or any other part of the statute was violated and, as we indicated above, it does not appear that the proceedings below caused him any prejudice or injury. Accordingly, based on the foregoing, the contention that the Board lacked the jurisdiction to hear plaintiff's cause is rejected.

■■ Plaintiff next contends that the findings of the Board were against the manifest weight of the evidence. This argument is patently incorrect. Plaintiff himself acknowledged his guilt of a number of the charges against him when he admitted drinking "Cold Duck" wine and blackberry brandy while on duty, storing the brandy in his locker at the fire house, allowing his men to drink the wine, and disobeying direct orders from Deputy Chief Harker, a superior officer. Additionally, the testimony of a number of witnesses regarding plaintiff's physical condition lends support to the Board's conclusion that he was in an intoxicated condition and could not properly perform his duties. Section 11 of

the Administrative Review Act (Ill. Rev. Stat. 1977, ch. 110, par. 274), provides that "[t]he findings and conclusions of the administrative agency on questions of fact shall be held to be prima facie true and correct." In *Dante v. Police Board* (1976), 43 Ill. App. 3d 499, 502, 357 N.E.2d 549, 552, we explained that:

> "It is not the duty of the court to weigh the evidence before the Board, but rather its duty is to ascertain if the findings and decision of the administrative agency are against the manifest weight of the evidence. (*Schnulle v. Board of Fire & Police Commissioners* (1974), 16 Ill. App. 3d 812, 818, 306 N.E.2d 906.) The reviewing court determines only whether there is any evidence which fairly tends to support the Board's determination and its decision should not be reversed unless the opposite conclusion is clearly evident. (*Davenport v. Board of Fire & Police Commissioners* (1972), 2 Ill. App. 3d 864, 868, 278 N.E.2d 212.)"

In light of the testimony referred to above, we conclude that the Board's determination that plaintiff was guilty of the charges was amply supported by the evidence, and should not be disturbed.

Plaintiff's remaining contention is that even if correct, the findings of the Board are not sufficient grounds upon which to order his discharge from the Oak Lawn Fire Department. The Board's discharge of plaintiff is only proper if his conduct constituted "cause" for dismissal. (Ill. Rev. Stat. 1975, ch. 24, par. 10—2.1—17.) Cause is construed to be some substantial shortcoming which renders the employee's continuance in office in some way detrimental to the discipline and efficiency of the service and which the law and sound public opinion recognize as good reason for his no longer holding his position. (*Caliendo v. Goodrich* (1975), 34 Ill. App. 3d 1072, 340 N.E.2d 560.) The Board's determination of cause will be reversed only if it is arbitrary and unreasonable. (*Fantozzi v. Board of Fire & Police Commissioners* (1963), 27 Ill. 2d 357, 189 N.E.2d 275.) Citing *Kreiser v. Police Board* (1976), 40 Ill. App. 3d 436, 352 N.E.2d 389, aff'd (1977), 69 Ill. 2d 27, 370 N.E.2d 511, as supportive, plaintiff argues that the Board's order discharging him was arbitrary and should be reversed.

■ We disagree with this argument, and find the reliance on *Kreiser* to be misplaced. In *Kreiser* this court found that Kreiser's actions were not sufficiently substantial or significantly related to the performance of his duties as a police officer to justify the penalty of discharge. Specifically, we noted that "by far the most egregious rule violation" proved against Kreiser was that he submitted to his superior a false police report, the subject matter of which was "only peripherally related to plaintiff's official police duties." (40 Ill. App. 3d 436, 440, 352 N.E.2d 389, 393.) In the instant case, however, plaintiff's rules violations amounted

to substantial shortcomings which were significantly and directly related to the performance of his duties. His defiance of Deputy Chief Harker's orders to take a breathalizer test and to leave the station could by itself constitute grounds for discharge. (See *Epstein v. Civil Service Com.* (1978), 47 Ill. App. 3d 81, 361 N.E.2d 782, *cert. denied* (1978), 435 U.S. 911, 55 L. Ed. 2d 502, 98 S. Ct. 1463; *Coursey v. Board of Fire & Police Commissioners* (1967), 90 Ill. App. 2d 31, 234 N.E.2d 339.) More significant, however, is his admitted drinking while on duty, and the finding of the Board, amply supported by the evidence, that he responded to an alarm in such an intoxicated condition that he could not perform his duties properly. It is no answer to argue, as plaintiff does, that he was concerned with doing a good job on the night in question, that there were no complaints from any citizens, and that his record as a fire fighter is generally good. When it is considered that people's lives and property may well depend on a fire fighter's proper performance of his duties, it must be concluded that plaintiff's conduct was a sufficient basis for the Board to order his discharge. Accordingly, based on all of the above, the judgment of the circuit court is affirmed.

Affirmed.

MEJDA and WILSON, JJ., concur.