ILLINOIS CENTRAL RAILROAD CO. ET AL. *v.* NOR-
FOLK & WESTERN RAILWAY CO. ET AL.

No. 15.   Argued October 11, 1966.—Decided November 14, 1966.*

---

*Together with No. 17, *Calumet Harbor Terminals, Inc., et al.* v.
*Norfolk & Western Railway Co. et al.* and No. 20, *United States et al.*
v. *Norfolk & Western Railway Co. et al.,* also on appeal from the
same court.

58

*William J. O'Brien, Jr.,* argued the cause for appellants in Nos. 15 and 17.   With him on the brief in No. 15 were *Robert H. Bierma* and *Edmund A. Schroer.*   With him on the brief in No. 17 was *Charles B. Myers.*

*Richard A. Posner* argued the cause for the United States et al. in No. 20.   With him on the brief were *Solicitor General Marshall, Assistant Attorney General Turner, Howard E. Shapiro* and *Robert W. Ginnane.*

*Theodore E. Desch* argued the cause for appellees in all cases.   With him on the brief were *Martin L. Cassell, Don McDevitt, John L. Bordes, Reuben L. Hedlund* and *Robert A. Deane.*

MR. JUSTICE CLARK delivered the opinion of the Court.

This is an appeal from the judgment of a three-judge District Court, 241 F. Supp. 974, setting aside orders of the Interstate Commerce Commission, 307 I. C. C. 493, 312 I. C. C. 277, 317 I. C. C. 502, which granted the

applications of seven railroads[1] to provide additional rail service to the Lake Calumet Harbor Port near the southern limits of Chicago, Illinois. The service was to be provided through the construction of a single line of track into the Chicago Regional Port District for the joint use of the seven railroads. At present the port is served directly by only one railroad, appellee Chicago, Rock Island and Pacific Railroad Company (Rock Island). Appellee New York, Chicago and St. Louis Railroad Company (Nickel Plate),[2] has facilities on the east side of Lake Calumet which has been reserved for future commercial development, but at present its facilities do not reach the port. The court, with one judge dissenting, rejected as not having "ample support" in the record, the findings of the Commission that the public convenience and necessity required the additional service applied for by the seven roads. It further found, unanimously, that the requirements of due process were violated by the Commission in its refusal to give Rock Island and Nickel Plate a hearing before approving a nonexclusive agreement, subsequently executed between the applicant roads and the Port District, covering the use of the latter's facilities. The court ordered a new hearing on all the issues, one judge concluding that such hearing should be limited to the subsequently executed nonexclusive use agreement. We noted probable jurisdiction, 382 U. S. 913, and reverse the judgment.

---

[1] Illinois Central Railroad Company; Pennsylvania Railroad Company; Chicago South Shore and South Bend Railroad; Belt Railway Company of Chicago; the New York Central Railroad Company; and the Indiana Harbor Belt Railroad Company. The Michigan Central Railroad Company sought additional trackage approval but had not signed a proposed lease with the Port District as the other appellants had.

[2] The Nickel Plate has merged into the Norfolk and Western Railway Company since this proceeding began.

I.

BACKGROUND OF LAKE CALUMET HARBOR PORT.

Lake Calumet Harbor Port is one of seven facilities within the Port of Chicago available for the handling of water-borne freight. It is a shallow lake approximately two miles in length and covers approximately 1,250 acres. It is accessible by water from Lake Michigan via the Calumet River into the heart of the Chicago switching district, a distance of some six miles.

As early as 1880 one of the Pullman companies constructed trackage that first brought rail service to Lake Calumet. Pullman reserved some 300 to 500 acres for the development of a harbor and later donated some acreage to the United States for the development of a turning basin. Comprehensive plans for dredging Lake Calumet harbor and the filling of submerged lands were prepared in 1916 by an engineer for the City of Chicago. In 1917 Pullman waived riparian rights to some four miles of Lake Calumet shoreline to the City of Chicago and in 1935 gave additional land to the United States for the purpose of widening the Calumet River.

In 1947 the Illinois Central, an appellant here, attempted to enter the port area. Pullman and two of the seven appellants here, New York Central and the Belt Railway Company of Chicago, opposed the application which was addressed to the Illinois Commerce Commission. In 1949, during the pendency of the proceeding, Rock Island acquired the common stock and certain industrial property of Pullman for $2,200,000. Rock Island then entered the proceedings in opposition to Illinois Central. The application of the latter was approved by the Illinois Commerce Commission but the Circuit Court of Cook County rejected it and the Supreme Court of Illinois affirmed in 1953. *Chicago, R. I.*

& P. R. Co. v. *Illinois Commerce Commission ex rel.*
*Illinois Central R. Co.*, 414 Ill. 134, 111 N. E. 2d 136.

The Interstate Commerce Commission in approving
the acquisition of Pullman by Rock Island—over the
objections of Illinois Central and the Belt Railway Com-
pany, each of which also sought to acquire Pullman or
a portion of its trackage on the lake—imposed certain
conditions on Rock Island designed to guarantee fair
practices, assure nondiscriminatory handling of the traf-
fic of other railroads to and from the lake and guaran-
tee the mutuality of traffic and operating relationships
theretofore existing between Pullman and the other
roads. Rock Island, however, continued to be the only
line providing direct service to the port.

The Chicago Regional Port District was created as a
municipal corporation by the State of Illinois in 1951.
Its purpose.was the development of Lake Calumet into
a major deep water port facility for both domestic and
import-export traffic via the St. Lawrence Seaway. In
1954 the Port District declared by resolution that the
public's, as well as the port's, interest required that its
trackage be accessible to as many railroads as possible.
In 1955 the Port District acquired the lake and some
adjoining property from the City of Chicago and began
dredging the lake and constructing port facilities at its
southern end; it also built 14 miles of railroad yard
"hold" tracks in the port, docks, two 6,500,000-bushel
grain elevators, three transit sheds occupying 300,000
square feet of space, a back-up warehouse with 200,000
square feet of space, and streets. These facilities cost
$24,000,000 and were paid for by the sale of Port Dis-
trict revenue bonds. By contract with the Port District
the Rock Island operates over the trackage of the
Port District and also serves the Calumet Harbor Ter-
minals, Inc., a private harbor facility. No other rail-
roads reach the port on their own tracks. The Nickel

Plate is the nearest rail facility. As previously noted, it has trackage on the east side of the lake which has been reserved for future development by the Port District. Any railroad wishing to service the port must use the facilities of Rock Island.

## II.

### THE APPLICATIONS BEFORE THE COMMISSION.

On October 22, 1956, the appellants Illinois Central Railroad Company and the Pennsylvania Railroad Company, requested authority from the Commission under the provisions of 49 U. S. C. § 1 (18) to construct 1.431 miles of new track that would connect their lines to the present trackage of an affiliate of Illinois Central that passes near Lake Calumet's southwestern shore. Similar applications were subsequently filed by the Chicago South Shore and South Bend Railroad, the Belt Railway Company of Chicago, the Michigan Central Railroad Company, the New York Central Railroad Company and the Indiana Harbor Belt Railroad Company. All of the applicants sought to operate directly to and from the Lake Calumet port, rather than use the facilities of the Rock Island. The latter, as well as the Nickel Plate, requested and was given leave to intervene as were other parties.[3] The Rock Island and Nickel Plate were the only objectors, the remaining intervenors all supporting the applications.

The original applications of the seven railroads did not specifically request authority from the Commission to operate over the Port District's tracks. It appears that appellants were under the impression that formal Commission authority was not necessary because of the

---

[3] Others included: the Secretary of Agriculture, the Port District, the Chicago Board of Trade, the Chicago Association of Commerce and Industry, and two private companies operating on the lake, Calumet Harbor Terminals, Inc., and North Pier Terminal Company.

fact that Rock Island was currently operating without it. Nevertheless, the applications covered the entire plan of operations proposed by appellants, including activity within the Port District as well as an unexecuted agreement covering the leasing of the Port District facilities which was attached to the application as an exhibit. This lease was before the Hearing Examiner during the 12-day joint hearing he conducted and was the subject of testimony and consideration. The appellants advised, and the Hearing Examiner concluded, that the appellants sought approval to operate within the Port District, as well as authority for the track extension. Accordingly, the Hearing Examiner recommended to the Commission that the entire project of the appellants be approved.

On October 5, 1959, the Commission adopted the Hearing Examiner's recommendations but ruled that the applicants should file supplemental applications covering their proposed operations within the Port District, as provided in the proposed lease with the District. The Commission discussed the lease and indicated that it was satisfactory. It did, however, feel that the exclusive right of operation clause should be eliminated. The Commission also ruled that Rock Island's service to Calumet Harbor Terminals, Inc., was not to be disrupted and that every industry located at Lake Calumet Harbor was to have direct rail service, not only from the applicants but the Rock Island and Nickel Plate, if they so elected.

In April 1960, the appellants, pursuant to the Commission's requirement, filed supplemental applications for specific authority to operate within the Port District. The proposed lease covered by these applications eliminated the exclusionary provisions to which the Commission had objected. Despite the request of Rock Island and Nickel Plate for a hearing on the new lease the Com-

mission found that the "technical deficiency" existing in appellants' original applications had been corrected by the filing of their supplemental applications; that the record of the previous hearing was adequate to support approval of the entire proposal of the appellants; and the applications, as supplemented, were approved.

In June 1961, however, the appellants and the Port District found it necessary to amend their operating agreement and appellants filed a second supplemental application asking for approval of the same. This agreement modified the one previously approved by the Commission. The old agreement had provided for a 5% annual rental for the use of the Port District's rail facilities based upon the valuation of the latter, but not to exceed $2 per car, loaded or empty, including locomotives. The new agreement provided for a flat charge of $2 for each loaded freight car; it also specifically eliminated industry-owned tracks within the Port District from the agreement; and provided that it did not affect the right of Rock Island to operate in the Port District nor grant any exclusive privilege to the appellants. The Commission, after once again denying appellees' request for a hearing, approved this final agreement on November 26, 1962. The Commission found that the changes merely clarified the rights and responsibilities of the parties. As to the rentals it found that "rentals generally may be considered reasonable where, as here, the facts of record disclose that nonaffiliated parties, after bargaining at arm's length, have entered into an agreement under which increased service will be offered to the public, all parties to the agreement will benefit financially, and the interveners' ability to. continue to serve the public will not be impaired." [4]

---

[4] 317 I. C. C. 502, 505.

## III.
### PROCEEDINGS IN THE DISTRICT COURT.

The Rock Island and Nickel Plate then filed this suit seeking to enjoin the Commission's orders and the three-judge District Court vacated the orders on the grounds we have stated.

The court found that it was faced with two basic problems: (1) whether there was "substantial evidence" to support the order of the Commission and (2) whether the refusal of the Commission to have a hearing on the lease agreement between the applicants and the Port District denied Rock Island and Nickel Plate due process of law.

With respect to the first problem the court found "substantial support" for some of the "important findings" of the Commission. However, it found that the record did not "offer ample support" for certain of its conclusions. These conclusions appeared to have been drawn by the Commission from the prior findings which the court had found to have "substantial support" in the record.

On the supplemental application for authority to operate within the Port District the court held there was insufficient evidence to support the order of approval; that the rental under the final contract was materially different from the provisions of the original plan and bound the Rock Island and Nickel Plate to operate under the same condition without affording them the right of a hearing. By a divided court it ordered a complete rehearing on all issues. We cannot agree with either the findings of the District Court or with its disposition of the case.

## IV.
### APPLICABLE STANDARD ON REVIEW.

At the outset the Commission and the appellant railroads contend that the court did not apply the correct standards in reviewing the Commission's action. As we

have noted, the court did reject certain "conclusions" of the Commission, as above indicated, with respect to the public convenience and necessity for additional rail service to Lake Calumet port on the ground that they did not have "ample support" in the record. The test on judicial review is, of course, whether the action of the Commission is supported by "substantial evidence" on the record viewed as a whole, 5 U. S. C. § 1009 (e)(5). Substantial evidence is "enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." *Labor Board* v. *Columbian Enameling & Stamping Co.,* 306 U. S. 292, 300 (1939). A careful reading of the opinion leads us to conclude that the court was applying the test of substantiality. Indeed, at four separate places in the opinion it uses the term "substantial evidence" as being the necessary requirement. As unfortunate as it is that the "ample support" language crept into the decision, we do not believe that the court was creating a "novel formulation" but rather inadvertently used the "ample support" terminology merely to meet the same language in the dissent referring to the conclusions of the Commission.

We have concluded that the court erred in setting aside the conclusions of the Commission. The Act authorizes the issuance of certificates such as the ones sought here when the Commission finds that the future public convenience and necessity will require additional railroad service. 49 U. S. C. § 1 (18). This Court has repeatedly held that if a railroad, voluntarily proposing the extension of its lines, can show that its proposal "either presently or in the reasonably near future will be self-sustaining, or so nearly so as not unduly to burden interstate commerce, the Commission may issue a certificate authorizing the proposed line," *Interstate Commerce Commission* v. *Oregon-Wash. R. & Nav. Co.,*

288 U. S. 14, 37 (1933). The Commission, however, "must be convinced that the proposed venture will not drain the railroad's resources and disable it from performing those duties of public service under which it then rested, with consequent detriment to the public in the matter of service and rates." *Ibid.* Also see *Texas & P. R. Co.* v. *Gulf, C. & S. F. R. Co.,* 270 U. S. 266, 277 (1926); *Chesapeake & O. R. Co.* v. *United States,* 283 U. S. 35, 42 (1931). Rock Island and Nickel Plate contend that the "evidence [of appellants] adduced before the Commission was so totally devoid of factual possibility as to be no evidence at all." As we read it, the evidence as to the future possibilities of the port was somewhat conflicting. The Commission, in keeping with its duty, resolved this conflict. Indeed, the findings of the Commission, which were upheld by the District Court, completely refute the Rock Island and Nickel Plate claims. Among the findings approved by the court [5] are the following: The port was "the major deepwater port facility of the port of Chicago," with "unparalleled access" to barge, rail, lake steamer and motor transportation and "complete access to ocean transportation" in the immediate future, with 71,490,510 tons of water-borne traffic in 1955 and with "material increases" [6] in tonnages predicted for the future from

---

[5] *Norfolk & Western R. Co.* v. *United States,* 241 F. Supp. 974, 977.

[6] The testimony was that rail traffic to and from the port in 1960 would be 27,000 carloads which could easily increase to 76,500 carloads in 1962, 115,000 carloads in 1968 and anywhere from 250,000 to 350,000 carloads a year when both sides of the lake are completed. There was also much testimony as to grain shipments. The seven States of Indiana, Illinois, Iowa, Missouri, Kansas, Nebraska and Colorado in 1956 produced 43% of all the wheat and 51% of the corn grown in the United States. The existing disparity in rates will divert much grain from Atlantic and Gulf ports for movement via Chicago and the St. Lawrence Seaway. Service to the port by

among an estimated 600 to 900 vessels coming to the Chicago port each season, that "will necessitate a substantially broadened railroad service into and out of the Lake Calumet port"; appellants' combined yard capacity was 61,601 cars, more than 12 times that presently available at the port; appellants' routing would be "more direct," entail less handling, expedite shipments and be less expensive than the present operation of Rock Island; and, finally, it was "imperative . . . that at the very beginning of this new era of development a plan and system for handling the transportation needs of the port be established which will assure the type of service that is expected and will provide for steady progress and expansion." We believe that these findings, in the light of others not overturned by the District Court, are sufficient to sustain the Commission's action in issuing the certificates.

Moreover, we believe that the District Court erred in striking down the conclusions of the Commission. These conclusions [7] included: Consideration of the whole record warranted the finding that the applications should be granted; granting them would result in greater rail competition, better service, greater car supply and lower rates for the industries served by the port; appellants would be "on a par" with the Rock Island in solicitation of grain traffic, and by having control of their cars they could return empties in a fast shuttle service to country elevators without interchange with Rock Island; the time has come when additional freight service is required for the future development of the Port District; better service can be given through elimination of delays, by single-line hauls or more direct hauls; a single trunkline rail-

one railroad does not appear adequate since the railroads serving the midwest grain-producing States terminate in Chicago and have extensive switching and classification yards which could be utilized.

[7] 241 F. Supp. 974, 979.

road service would be detrimental and a hindrance to the development of the harbor, and, although the port is served by some 100 common carrier trucklines, the Rock Island is the only railroad presently serving the port; the future convenience and necessity must be given "a higher value" than the present convenience and necessity; the proposed construction either presently or in the reasonably near future is necessary to meet a public need and will be reasonably profitable; and, finally, considering the expansion program at the port and the increased rail traffic to be made available the Commission is "of the opinion that the additional service . . . is warranted." As we have said, these conclusions were largely based upon previous Commission findings which the District Court approved. The Commission's function is to draw such reasonable conclusions from its findings as in its discretion are appropriate. As we said in *Consolo* v. *Federal Maritime Comm'n,* 383 U. S. 607, 620 (1966), "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." It is not for the court to strike down conclusions that are reasonably drawn from the evidence and findings in the case. Its duty is to determine whether the evidence supporting the Commission's findings is substantial, *Universal Camera Corp.* v. *Labor Board,* 340 U. S. 474 (1951). Having found that there was substantial support in the record for the Commission's findings as to the port's future potential and the necessity of providing competitive rail service at the outset of the port's development, it was not the District Court's function to substitute its own conclusions for those which the Commission had fairly drawn from such findings. Its agreement with the controlling subsidiary findings required the District Court to sustain the Commission's conclusions.

The court also erred, we believe, in ordering a new hearing on the issues. It found that the Commission's order issuing a certificate of public convenience and necessity to operate within the Port District was not supported by sufficient evidence and violated due process in that a hearing was not afforded the appellees thereon.

As we view the original applications of the appellants they proposed "to extend their operations to serve the Lake Calumet Harbor District near Chicago, in Cook County, Illinois ·. . . future industries, elevators, warehouses, docks and piers in the Calumet Harbor Port area." The prayer was that "your Commission issue a certificate of public convenience and necessity authorizing the construction and operation for which authority is herein sought." [8] The proceeding came on for a hearing before the Hearing Examiner on September 30, 1957, and counsel for the Rock Island stated for the record that his understanding was "the issue in this case is that all applications are for the purpose. of handling *import* and *export* business only *to and from* the Port District Harbor of Chicago . . . ." (Emphasis supplied.) And counsel for the appellants stated that the plan was "to handle interstate business to and from the area over which the port has jurisdiction. We have no such limitation at all as to import or export trade." Likewise, the "Return to Questionnaire" executed by appellants stated: "The line proposed to be constructed and operated will receive material revenue from freight traffic to be handled to and from industries, elevators, warehouses, docks, and piers presently operating in the Calumet Harbor Port area, in addition to those facilities to be constructed with the

---

[8] Application of Illinois Central, Pennsylvania, and Chicago South Shore and South Bend railroads filed October 19, 1956, with the Interstate Commerce Commission.

further development of the area." [9]   To make it crystal clear paragraph 10 of the same answer to the questionnaire stated:

> "The Lake Calumet Port District, which the proposed line will serve is currently served by the Chicago, Rock Island and Pacific Railroad Company by virtue of its acquisition of the Pullman Railroad Company, through purchase of capital stock, and lease by the former of the railroad property of the latter approved and authorized by the Commission in Finance Docket No. 16252, *Pullman Railroad Company Control*, decided November 17, 1949."

The other applications had similar allegations and the other appellants' questionnaire returns contained like statements.   Moreover, the answers filed on May 16, 1957, by Rock Island and Pullman to the applications, addressed themselves solely to the proposition that "applicant's extension of its line of railroad and operations through trackage rights to serve territory [the Port District] heretofore served exclusively and adequately by petitioners cannot be supported by public convenience and necessity, could mean only a duplication of rail service, and would create unsound and uneconomic conditions in transportation."

As we read the record before the Hearing Examiner the case was tried on the theory that the applications included the proposed operations within the Port District. During the presentation of appellants' evidence objection was made to the introduction of the proposed lease between appellants and the Port District on the ground that it was beyond the scope of the application.   The Hearing Examiner overruled the objection.   The testimony of virtually all of the appellants' witnesses was

---

[9] Return of Illinois Central, Pennsylvania, and the Chicago South Shore and South Bend, R. 17.

directed to some phase of the operations of the Port District. It should also be noted that the appellees sought to rebut this testimony in voluminous detail. For example, 40 pages of the record detail the testimony of Mr. R. C. Davidson, a witness for Rock Island. His testimony is devoted to Rock Island's operation in the United States with specific reference to the Port District. It compares Rock Island's operation in the Port District with that proposed by the appellants and answers in detail the statistics of the appellants as to charges, rates, switching problems, etc., involved in operations within the Port District. Page after page of prepared statistics on the costs, profits, etc., of the proposed operation were included in the testimony, together with forecasts as to the impact of the same, if permitted, on Rock Island's operations. Another witness for Rock Island, Professor Marvin L. Fair, testified for some 15 pages on the potential of the Port District. His research was in great depth and included comparisons with other Great Lakes ports; estimated traffic of the Port District, including iron ore, grain, and general cargo; physical conditions of navigation at the port; the effect of tolls; the capacity of the Welland Canal (in the St. Lawrence Seaway) and its impact on the port; the efficiency of the port facilities; established movement of exports and imports; the effect of political, military, and economic conditions at home and abroad and the adequacy of Rock Island's service.

The record establishes beyond a doubt that the appellants were in fact seeking Commission approval of the entire project. Their offering of the unexecuted, proposed contract into evidence is one of many indications of this fact. The Hearing Examiner specifically noted, at the time the contract was received in evidence, that its approval by the Commission was necessary in order for the appellants to serve the Port District as they proposed. It would, indeed, have been a futile act for the appellants

to seek and attain approval to extend their lines to the Port District but not be able to enter it!

It is true that appellees objected to the introduction of the proposed agreement because they felt, and rightly so, that the application which the appellants had submitted was not technically broad enough for the authority they sought. The Hearing Examiner overruled them and they were obliged to—and did—offer their evidence on the matter. When the question came before the Commission for decision, it ruled that the applications were technically deficient and permitted the parties to correct the same through the filing of supplemental applications. At no time did the Commission find that the proposal to operate within the Port District had not been adequately explored and examined. Rather, a careful reading of the Commission's entire opinion leads us to the opposite conclusion. At every stage of the proceedings before the Hearing Examiner and also before the Commission, operations of the appellants within the Port District were considered an integral part of the overall plan which they submitted.

The ruling of the Commission that the supplemental applications should be considered in "conjunction with the original application," did not, in our view, deprive appellees of due process of law. When appellees requested a full hearing on the supplemental applications the grounds they alleged were that they were adequately serving the port; that they were prepared to spend further sums of money in the construction of facilities to serve it; that they were entitled to retain the traffic of the Port District; that there was no adequate reason for extension of the railroad lines of appellants into territory heretofore served exclusively by appellees; and that the extension of the railroad lines of appellants was not justified by public convenience and necessity. As the Commission itself found, "Examination of the record discloses

that these are the same arguments and contentions that were set forth in protestants' original briefs, exceptions to the examiner's proposed report, in their petitions for reconsideration, and in their oral arguments." *Illinois Central R. Co. Construction and Trackage,* 312 I. C. C. 277, 280.

The changes in the proposed lease agreement which the Commission approved without a further hearing involved the removal of the "exclusive right to operate within the Port" clause, which that document had given the appellants, and the formula for determining the annual rental to be charged by the Port District. As to the former, it can hardly be maintained that this worked a hardship or detriment upon the appellees. The removal of the clause, in fact, made certain that appellees were not precluded from continuing their present operations. As to the rental clause, it will be remembered that the original proposed agreement provided for 5% annual rental based on the value of the land and tracks, but not to exceed $2 per car. This was changed in the first supplemental application to a charge of not to exceed $2 per revenue car or locomotive. The final contract merely provided for a charge of $2 for each revenue car, which was much more favorable to the appellants than either of the former clauses. Moreover, the final charge compared favorably to other per-car rates previously approved by the Commission. In the light of these considerations, as well as the fact that appellees were invited and refused to sit in on the negotiation of the contract; had ample opportunity and did present their evidence as to the reasonableness of the charge for the use of Port District property; were, and are, in nowise bound by the contract; and, finally, in view of the insignificance of the changes in the final agreement compared with the former ones, we are led to conclude that appellees were not entitled to another hearing.

Appellees also insist that a new hearing be held so that evidence of "present conditions" could be presented to the Commission rather than "speculation." It is true that this case has been pending for 10 years but this, rather than being a reason for holding additional hearings, operates to the contrary. We have concluded that the orders of the Commission were proper under the circumstances. We have found substantial support for its actions. Accordingly, it is our view that this matter be concluded.

The judgment is therefore reversed and the case is remanded to the District Court with directions to sustain the Commission's orders. *It is so ordered.*

Mr. Justice Black, dissenting.

The District Court set aside an order of the Interstate Commerce Commission on the ground that the evidence failed to support its findings of fact. I dissent from the Court's reversal of that holding. In *Universal Camera Corp.* v. *Labor Board,* 340 U. S. 474, 488, it was said that "Congress has merely made it clear that a reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view." In the case here the District Court found that it could not conscientiously support the Commission's findings and I would affirm its judgment, adhering to the principles so firmly announced in *Universal Camera, supra.*