James Kenneth GALLAGHER, Petitioner,

v.

NATIONAL TRANSPORTATION SAFETY BOARD and Administrator, Federal Aviation Administration, Respondents.

No. 90-9544.

United States Court of Appeals, Tenth Circuit.

Jan. 14, 1992.

J. Scott Hamilton, Broomfield, Colo., for petitioner.

William G. Cole, Atty., Civ. Div., Dept. of Justice (Stuart M. Gerson, Asst. Atty. Gen., Anthony J. Steinmeyer, Atty., Civ. Div., Dept. of Justice, with him on the brief), Washington, D.C., for respondents.

Before MOORE and EBEL, Circuit Judges, and ANDERSON, District Judge.*

ALDON J. ANDERSON, Senior District Judge.

By this appeal, Petitioner seeks review of an order by the Respondent, National Transportation Safety Board ("NTSB"), affirming the revocation of Petitioner's Airman Certificate and airline transport privileges by the Administrator of the Federal Aviation Administration ("FAA"). This court has jurisdiction pursuant to 49 U.S.C.App. § 1486(a) (1988). Petitioner raises two issues on appeal. First, whether the NTSB's order affirming the revocation of his certificate was based on inadequate evidence. Second, whether the NTSB was deprived of jurisdiction to enter its order affirming the revocation because, by the time the NTSB issued its final order, the statutorily prescribed time period for addressing Petitioner's appeal of the revocation had expired. We answer both questions in the negative and therefore affirm the NTSB's order.

---

\* The Honorable Aldon J. Anderson, Senior District Judge of the United States District Court for the District of Utah, sitting by designation.

## I. Factual Background [1]

On April 19, 1990, Petitioner was assigned as pilot in command of a commercial airline flight. At approximately 7:30 a.m. on the morning of the 19th, while Petitioner was engaging in pre-flight preparation in anticipation of the flight's immediate departure from Denver, an FAA inspector detected what she believed to be the odor of alcohol emanating from Petitioner. R. at 56–59. The FAA inspector communicated her concern to local officials of the private airline that employed Petitioner. *Id.* at 59. Airline officials withdrew Petitioner from the flight, and subsequently took him to a nearby medical clinic where a blood sample was drawn. R. at 67–68, 82. The blood sample was sent to a New Jersey laboratory where a blood alcohol level toxicological test was conducted. Both Petitioner and Respondent agree that, in the course of packaging that blood sample for shipment, the technician who prepared the sample failed to follow the prescribed "chain of custody" instructions. Specifically, the technician simply wrapped a length of tamper-resistant tape around the body of the vial containing the blood sample rather than applying the tape vertically up one side of the vial, across the top of the cap of the vial, and down the other side such that any attempt to remove the vial's cap would have been detectable. R. at 86–87. Had the recommended procedure been followed, the chain of custody clearly would have been unbroken from the time the seal was applied to the vial until the time it was broken by laboratory employees after its arrival in New Jersey for testing. However, because of the manner in which the medical technician actually fastened the seal, the cap to the vial could have been removed and replaced without

detection between the time the sample was drawn and the time it was analyzed.

This first blood sample was drawn at about 9:10 a.m. R. at 88. Subsequently, at Petitioner's request, his personal physician drew another sample and submitted it to a local laboratory for testing. R. at 452–53. This second sample was drawn at approximately 10:40 a.m. on the morning of April 19th. *Id.* The New Jersey laboratory returned a toxicological report advising that its analysis of the first blood sample revealed a blood alcohol level of .042 percent. R. at 278; Addendum to Petitioner's Br., Ex. G–2. A confirming test by the New Jersey laboratory revealed a .038 percent[2] blood alcohol level. R. at 280; Addendum to Petitioner's Br., Ex. 3. With respect to the second blood sample drawn by Petitioner's personal physician, the local laboratory reported a blood alcohol level of .0229 percent. R. at 455, 348.

After receiving the results of the first blood sample from the New Jersey laboratory, the FAA, on April 27, 1990, issued an Emergency Order of Revocation ("Emergency Order") which revoked Petitioner's Airman Certificate. The legal basis for the FAA's order was Petitioner's alleged violation of Section 91.11(a)(4) of the Federal Aviation Regulations which prohibited attempting to act as a crew member of a civil aircraft while having a blood alcohol level in excess of .04 percent.[3]

On May 3, 1990, Petitioner appealed the Emergency Order, and on May 31, 1990, a hearing was held before a NTSB administrative law judge ("ALJ"). At that hearing, the ALJ determined that the above-described defects in the handling and packaging of Petitioner's blood sample resulted in a break in the chain of custody. Because of this break in the chain of custody,

---

**1.** Unless otherwise or more specifically indicated, all facts are drawn from the Record of Decision, Doc.Trans. No. 461472.

**2.** In his deposition, Dr. John E. Heveran, Clinical Laboratory Director at the New Jersey laboratory, testified that the .004 percent difference between the original and confirmatory tests performed by the laboratory was "consistent" "within the levels of analytical methodology." R. at 309.

**3.** Section 91.11 of the Federal Aviation Regulations provided:

> (a) No person may act or attempt to act as a crewmember of a civil aircraft—
>
> \* \* \* \* , \* \*
>
> (4) While having .04 percent by weight or more alcohol in the blood.

14 C.F.R. § 91.11(a) (1990). This section is currently found at 14 C.F.R. § 91.17 (1991).

the ALJ further found that the sample was not adequately authenticated and ruled that the laboratory report based on the blood sample was therefore inadmissible. Having excluded the toxicological report, the ALJ concluded that there was no other evidence to prove Petitioner's blood alcohol level on the morning of April 19, and reversed the Emergency Order.

On the FAA's appeal to the full Board, the NTSB reversed the ALJ, concluding that the testimony of the measures taken in packaging and shipping the sample were adequate to "show that the actual chain of custody had not been broken." R. at 409. The NTSB remanded the case to the ALJ with instructions to admit the toxicological report based on the first sample extracted from Petitioner.

On remand, the ALJ admitted the toxicological reports based on both of the blood samples taken from Petitioner. However, the ALJ persisted in his assessment that there was insufficient authentication of the samples and gave the reports no weight in his consideration of the issues. Because of the resulting lack of credible evidence in support of the FAA's charges against Petitioner, the ALJ once again reversed the FAA's Emergency Order.

On appeal the second time to the NTSB, the Board again reversed the ALJ's decision. The NTSB ruled that its former order resolved the issue of admissibility and that, thenceforth, the ALJ became obliged to "give the report such weight as would be due any documentary evidence whose substantiality, reliability and probative value had not been successfully attacked." R. at 589. Because the NTSB determined that Petitioner had not significantly challenged the reliability of the toxicological report on the first drawn blood sample, it found a sufficient factual basis for the charge that Petitioner had violated the applicable regulations. Thus, the NTSB affirmed the Emergency Order. This order was dated July 24, 1990, seventy-four days after the FAA advised the NTSB of the emergency nature of the suspension order.[4] Petitioner now appeals the NTSB order affirming the FAA's Emergency Order revoking his certificate.

## II. Sufficiency of Evidence Underlying the Order

Upon timely petition by a person disclosing a substantial interest therein, "[a]ny order ... issued by the [NTSB] ... shall be subject to review by the courts of appeals of the United States." 49 U.S.C.App. § 1486(a) (1988). In the course of judicial review of NTSB orders, "[t]he findings by the [NTSB] ..., if supported by substantial evidence, shall be conclusive." Id. § 1486(e); see also 5 U.S.C. § 706(2)(E) (1988) (under Administrative Procedures Act, reviewing court shall hold unlawful and set aside agency findings found to be unsupported by substantial evidence). This court has circumscribed the extent of review of NTSB findings of fact. In Sorenson v. National Transportation Safety Board, 684 F.2d 683 (10th Cir.1982), the court explained that

> [o]n review we must uphold the Board's findings of fact if they are supported by substantial evidence in the record. 49 U.S.C. § 1486(e); Sanchez v. National Trans. Safety Bd., 574 F.2d 1055 (10th Cir.). Our function is not to weigh the evidence or to evaluate the witnesses' credibility. Loomis v. McLucas, 553 F.2d 634 (10th Cir.); Nadiak v. C.A.B., 305 F.2d 588 (5th Cir.).

Id. at 685.

Applying this standard of review, we must now address Petitioner's argument that the NTSB order affirming the FAA's Emergency Order in his case is not supported by substantial evidence. The sole premise for Petitioner's claims that the NTSB order was not supported by substantial evidence is the alleged inadequacy of

---

**4.** On May 7, 1990, the FAA sent a letter to the NTSB that responded to Petitioner's appeal of the FAA Emergency Order. Attached to that letter were copies of the Emergency Order which the FAA submitted as the "complaint" in the NTSB appeal. R. at 5. The Office of Administrative Law Judges of the NTSB received that letter on May 11. Therefore, this court determines that, for purposes of Section III of this opinion, May 11 was the time the NTSB was advised of the emergency nature of the FAA order. See infra Section III.

the chains of custody relative to the two blood samples drawn from Petitioner. With respect to the first sample, Petitioner points to the failure of the medical technician who packaged the sample for shipment to properly affix the tamper-resistant seal on the vial containing the sample. Additionally, Petitioner relies on the FAA's failure to prove the identity of and obtain authenticating testimony from at least two parties who handled the sample after its arrival at the New Jersey laboratory, one of whom initially removed the vial from its sealed outer package. Petitioner argues that because these two parties remained unidentified, the New Jersey laboratory could not be sure that the sample had not been tampered with or contaminated prior to testing.

Regarding the second blood sample that was drawn by Petitioner's personal physician, Petitioner relies on the failure of the Administrator to offer any evidence relative to that sample's chain of custody beyond the testimony of the physician who drew the sample and then gave it to a member of his staff to be packaged and shipped to the testing facility. Given this lack of evidence establishing a complete chain of custody, Petitioner argues that the second blood sample was likewise inadequately authenticated and the NTSB erred in its reliance on that sample.

Petitioner apparently relies on two separate legal theories in arguing that the NTSB's order was not based on substantial evidence. First, in his brief, Petitioner argues that a precondition to the admissibility of real evidence under Federal Rule of Evidence 901(a) is authentication—that is some proof sufficient to establish that the evidence is what it purports to be. Petitioner then concludes that, because the FAA was unable to establish a complete chain of custody for the sample tested in New Jersey, the evidence was not properly authenticated and cannot therefore be substantial evidence in support of the NTSB order. Implicit in Petitioner's conclusion is the argument that the evidence was not authenticated and therefore was improperly admitted for consideration by the NTSB.

The first issue is, therefore, whether the NTSB improperly admitted the toxicological report submitted by the New Jersey laboratory because of the medical technician's undisputed failure to strictly comply with the proper shipment and packaging procedures. Petitioner suggests that the chain of custody that the FAA actually established for the blood sample was insufficient to satisfy the authentication requirements of Federal Rule of Evidence 901(a).[5]

 We need not determine the admissibility of the blood sample under the Federal Rules of Evidence in order to resolve this case. "[A]gencies are not bound by the strict rules of evidence governing jury trials." *Sorenson,* 684 F.2d at 686 (citing *Morton v. Dow,* 525 F.2d 1302, 1307 (10th Cir.1975)). The standard for admission of evidence in an agency proceeding is found in the Administrative Procedures Act and allows "[a]ny oral or documentary evidence" except "irrelevant, immaterial, or unduly repetitious evidence." 5 U.S.C. § 556(d); *see also Sorenson,* 684 F.2d at 686 (applying the APA's "irrelevant, immaterial, or unduly repetitious" standard to NTSB proceedings). Under this standard, in order to be admissible for consideration in an administrative proceeding, the evidence need not be authenticated with the precision demanded by the Federal Rules of Evidence. However, this somewhat lower evidentiary standard does not completely obviate the necessity of proving by competent evidence that real evidence is what it purports to be. Absent any such proof, the evidence to be admitted would be irrelevant or immaterial and hence should be excluded from the proceeding.

 In the present case, we conclude that the toxicological report submitted by the New Jersey laboratory and relied on by the FAA in issuing its Emergency Order was sufficiently authenticated to be admissible for consideration by the NTSB. The

---

5. The Rule Provides: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed.R.Evid. 901(a).

technician who drew the sample from Petitioner testified that she identified the sample as that of Petitioner with a pre-numbered identification tape and then placed the vial into a box which was sealed for shipment. R. at 82–87. There was no reported irregularity in the shipment of the sample to the New Jersey laboratory. Although there was no testimony from the employee or employees of the laboratory who actually physically received the sample and opened the sealed box in which it was shipped,[6] other evidence demonstrated that the sample was received and processed up until the actual testing was done without irregularity. R. at 102, 139–40. There was a "chain of custody" form that accompanied the sample throughout the process and on which any irregularity was to have been noted. R. at 87, 198. The only indication of irregularity was the testing technician's notation that the vial containing the sample had not been properly taped with the tamper-resistant seal. R. at 243, 253. For this admitted deficiency in the procedure, however, there was a plausible explanation. The packaging technician simply failed to execute the instruction and has so testified. R. at 86–87. Moreover, there has been no evidence or suggestion that the sample was actually tampered with or contaminated. Indeed, the facts show that the vial was placed in a specially sealed box for shipment and arrived in New Jersey for testing without incident. *Id.* From the absence of any notation of irregularity, the NTSB could properly infer that the box arrived sealed at the laboratory and was tested in the condition in which it was shipped. In order to reach the opposite result, the NTSB would have been forced to assume either that the integrity of the sample was compromised en route and was simply overlooked by the receiving agent or, alternatively, that the sample was deliberately tampered with once it reached the laboratory. Adoption of one of these scenarios would have required the NTSB to infer either some deliberate act of tampering or extremely gross negligence in the handling of the sample by the laboratory staff—an inference without any express or

implicit support in the evidence. In short, the NTSB relied on a toxicological report that revealed Petitioner's blood alcohol level. The report was supported by a significant quantum of authenticating foundation evidence. Petitioner is correct in his assertion that the chain of custody relating to the sample was somewhat compromised. This court, however, declines to hold that such a compromise renders the report immaterial or irrelevant so as to preclude admission in an administrative proceeding.

■ Petitioner's next argument that the NTSB's order was not based on substantial evidence attacks not the Board's decision to admit the toxicological reports, but its assessment that the reports constituted substantial evidence that Petitioner's blood alcohol level actually exceeded the limits set forth in the applicable regulation. The logic underlying this argument is that, even assuming that the reports were sufficiently authenticated to be admissible, they still were not authenticated as to weight such that they could be substantial evidence supporting the suspension of Petitioner's certificate.

Petitioner is correct in asserting that the "substantial evidence" standard required on judicial review of NTSB factual findings is distinguishable from the "irrelevant, immaterial and unduly repetitious" standard required to avoid exclusion of evidence from an administrative proceeding. Substantial evidence has been defined to be "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. National Labor Relations Bd.*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938) (citations omitted); *see also Pacheco v. Sullivan*, 931 F.2d 695, 697 (10th Cir.1991) (in administrative proceeding, evidence is substantial if a reasonable mind accepts it as support for conclusion; mere scintilla is not substantial). Moreover, to be substantial, evidence must be "enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be

6. R. at 120–21, 123–24.

drawn from it is one of fact for the jury." *National Labor Relations Bd. v. Columbian Enameling & Stamping Co.,* 306 U.S. 292, 300, 59 S.Ct. 501, 505, 83 L.Ed. 660 (1939) (citations omitted); *see also Illinois Cent. R.R. Co. v. Norfolk & W. Ry. Co.,* 385 U.S. 57, 66, 87 S.Ct. 255, 260, 17 L.Ed.2d 162 (1966) (same); *Diamond Ring Ranch, Inc. v. Morton,* 531 F.2d 1397, 1404 (10th Cir.1976) (substantial evidence is that quantum of evidence which will justify refusal by a court to direct a verdict).

Applying these standards, we conclude that the decision of the NTSB affirming the FAA's Emergency Order is supported by substantial evidence. Having already determined that the toxicological reports of the two blood tests drawn from Petitioner were properly admitted for consideration by the Board, we find no evidence suggesting that either of the reports were inaccurate in their respective representations of the alcohol content of Petitioner's blood at the relevant times. Moreover, in the course of the administrative proceeding, the FAA introduced expert testimony that, based on the blood alcohol levels as reported and on standard and specific alcohol excretion rates, Petitioner's blood alcohol level at the time in question was approximately .064 percent. R. at 468. This level clearly exceeds the .04 percent level established by the applicable regulation. It is true that Petitioner introduced his own expert testimony that alcohol excretion or elimination rates can vary from person to person based on a variety of factors, R. at 486, and that this evidence arguably would have supported a decision contrary to the Board's. The function of this court in reviewing an agency's factual conclusions, however, is not to weigh the evidence but merely to insure that the decision is supported by substantial evidence. *Illinois Cent. R.R.,* 385 U.S. at 69, 87 S.Ct. at 262 ("It is not for the court to strike down conclusions that are reasonably drawn from the evidence"); *Sorenson,* 684 F.2d at 685. Moreover, the simple fact that two inconsistent conclusions may be drawn from the evidence presented does not mean that the agency's conclusions are not supported by substantial evidence. *Yaffe Iron*

*& Metal Co. v. United States Envtl. Protection Agency,* 774 F.2d 1008, 1014 (10th Cir.1985). Therefore we conclude that the NTSB's decision affirming the FAA's Emergency Order was supported by substantial evidence and reject Petitioner's claim insofar as it is based on that argument.

### III. Jurisdiction

■ The Administrative Procedure Act requires a reviewing court to "set aside agency action ... in excess of statutory jurisdiction." 5 U.S.C. § 706(2)(C) (1988). Petitioner argues that the NTSB order affirming the suspension of his certificate is without statutory jurisdiction and must accordingly be dismissed. The basis for Petitioner's argument is that the Board failed to finally dispose of his appeal within sixty days as required by 49 U.S.C.App. section 1429(a). That statute provides, in part:

> The filing of an appeal with the National Transportation Safety Board shall stay the effectiveness of the Secretary of Transportation's order unless the Secretary of Transportation advises the National Transportation Safety Board that an emergency exists and safety in air commerce or air transportation requires the immediate effectiveness of his order, in which event the order shall remain effective and the National Transportation Safety Board *shall finally dispose of the appeal within Sixty days after being so advised* by the Secretary of Transportation.

49 U.S.C.App. § 1429(a) (1988) (emphasis added). The regulations applicable to NTSB resolution of appeals of emergency orders provide instruction for the calculation of the sixty-day period set forth by section 1429(a):

> (b) *Effective date of emergency.* The procedure set forth herein shall apply as of the date when the Administrator's written advice of the emergency character of his order has been received by the Office of Administrative Law Judges or by the Board.

> (c) *Computation of time.* Time shall be computed in accordance with § 821.10,

including the provision that Saturdays, Sundays, and legal holidays of the Board shall always be counted in the computation.

49 C.F.R. § 821.54(b)–(c) (1990). Section 821.10, in turn, provides:

In computing any period of time prescribed or allowed by ... any applicable statute, the date of the act, event, or default after which the designated period of time begins to run is not to be included in the computation. The last day of the period so computed is to be included unless it is a Saturday, Sunday, or legal holiday for the Board, in which event the period runs until the end of the next day which is neither a Saturday, Sunday, nor a legal holiday for the Board shall be computed in the calculation of time in all emergency cases.

*Id.* § 821.10. Thus, the sixty-day period within which the Board was required to finally dispose of Petitioner's appeal began running on the date when the FAA's written notice of the emergency nature of the suspension of Petitioner's certificate was received by the Office of Administrative Law Judges of the NTSB.

In this case, that date was May 11, 1990, the date the Office of Administrative Law Judges of the NTSB received a letter from the FAA notifying the Board that the Emergency Order revoking Petitioner's certificate would serve as the complaint in the NTSB proceedings. R. at 5; *see also supra* note 4. Therefore, the NTSB had sixty days after May 11 to dispose of the appeal. Applying the above-quoted regulations, this sixty-day period would have expired on Friday, July 10, 1990. However, the NTSB did not issue its final order affirming the FAA suspension order until July 24, fourteen days after the expiration of the statutorily prescribed period. The NTSB thus clearly failed to comply with the dictates of the statute.

Petitioner argues that the Board's failure to finally dispose of his case within the statutory period deprived the Board of jurisdiction to continue its proceedings. Petitioner originally raised this jurisdictional issue in his Motion to Dismiss the FAA's appeal of the ALJ's initial decision, where he argued that "the Board has lost jurisdiction to entertain the Administrator's appeal and has no choice but to dismiss that appeal for lack of jurisdiction." R. at 554.

In its July 24 order affirming the FAA Emergency Order, the NTSB denied Petitioner's Motion to Dismiss, concluding,

[t]he 60–day provision seeks to minimize the adverse impact of the loss of an airman's certificate prior to an adjudication of the validity of the suspension; it does not, in our judgment, operate to divest us of jurisdiction to rule on an appeal whose processing unavoidably consumes more than 60 days.

R. at 591.

We refuse to adopt the construction of section 1429(a) that Petitioner urges upon us. Petitioner cites no case or other authority in support of his argument that the NTSB's failure to finally dispose of the appeal within sixty days completely divests the Board of jurisdiction to hear the appeal. We decline to create such precedent by this case given the lack of any indication whatsoever in either the text of the statute or the available legislative history to suggest that such a drastic result was contemplated by Congress in enacting section 1429(a).

Although we agree with the NTSB's ultimate conclusion that its failure to timely dispose of Petitioner's appeal does not deprive the Board of jurisdiction, we cannot agree with the Board that the reason it does not lose jurisdiction is because the sixty-day period established by section 1429(a) is merely a target period or a recommended duration for the NTSB appeals process to run its course. Such a construction of the statute would subvert the plain meaning of the relevant statutory passage. By unambiguous language, the statute directs that "the Board *shall* finally dispose of the appeal within sixty days." 49 U.S.C.App. § 1429(a) (1988) (emphasis added). Congress obviously intended by its use of such imperative language that the NTSB's failure to comply with the mandate would have some consequence. What precisely Congress intended that consequence to be is not explicit in the statute. How-

ever, our conclusion that Congress did not intend to deprive the NTSB of jurisdiction to complete appeals pending before it in the event the sixty-day period is exceeded is consistent with the recent teachings of the United States Supreme Court regarding the appropriate construction of statutory time limits such as are here involved. In *Brock v. Pierce County*, 476 U.S. 253, 260, 106 S.Ct. 1834, 1839, 90 L.Ed.2d 248 (1986), The Court held that the 120–day statutory time limit then part of section 106(b) of the Comprehensive Employment and Training Act ("CETA"), 29 U.S.C. § 816(b) (1976, Supp. V),[7] was not jurisdictional. Under CETA, the federal government provided grants to qualifying entities for the implementation of programs to provide "job training and employment opportunities for economically disadvantaged, unemployed, or underemployed persons." 29 U.S.C. § 801 (1976 ed., Supp. V). Section 106(b) required that, if the Secretary of Labor had reason to believe that any CETA grant recipient was misusing CETA funds or otherwise violating applicable regulations, the Secretary "shall investigate the matter" and "shall" determine the truth of the allegation not later than 120 days after receiving the complaint. 29 U.S.C. § 816(b) (1976 ed. Supp. V). In holding that the Secretary's failure to comply with the 120–day period was not jurisdictional, the Court explained:

> This Court has frequently articulated the "great principle of public policy, applicable to all governments alike, which forbids that the public interests should be prejudiced by the negligence of the officers or agents to whose care they are confided." *United States v. Nashville, C. & St. L.R. Co.*, 118 U.S. 120, 125 [6 S.Ct. 1006, 1008, 30 L.Ed. 81] (1886). *See also Guaranty Trust Co. v. United States*, 304 U.S. 126 [58 S.Ct. 785, 82 L.Ed. 1224] (1938); *Stanley v. Schwalby*, 147 U.S. 508, 515 [13 S.Ct. 418, 421, 37 L.Ed. 259] (1893). We would be most reluctant to conclude that every failure of an agency to observe a procedural requirement voids subsequent agency ac-

tion, especially when important public rights are at stake. *When, as here, there are less drastic remedies available for failure to meet a statutory deadline, courts should not assume that Congress intended the agency to lose its power to act.*

*Pierce County*, 476 U.S. at 260, 106 S.Ct. at 1839 (footnote omitted; emphasis added). The Court further observed that, under the facts of *Pierce County*, there was at least one available remedy less drastic than divesting the Secretary of Labor of jurisdiction to complete the investigation. Specifically, the Court noted that, under the Administrative Procedures Act, a reviewing court may "compel agency action unlawfully withheld or unreasonably delayed." *Id.* at 260 n. 7, 106 S.Ct. at 1839 n. 7 (quoting 5 U.S.C. § 706(1)). Therefore, any party aggrieved by the Secretary's failure to comply with the statutory time-limit would have the right to enforce its rights by initiating an action in district court. *Id.* We see no reason why persons aggrieved by the NTSB's failure to comply with the statutory time limits for addressing appeals would not be entitled to a similar remedy.

We recognize that the public and private interests here involved are easily distinguished from those in *Pierce County*. The Secretary's failure to dispose of an investigation of CETA fund misuse within the prescribed 120–day period would have no apparent immediately prejudicial effect to any party. Indeed, the only discernible consequence of the Secretary's failure would be the risk that the abuse of public revenue might continue for an unspecified period. On the other hand, the NTSB's failure to finally dispose of a pilot's appeal of an FAA emergency suspension engenders extreme consequences for the accused pilot, who is immediately and absolutely barred from his or her chosen profession. Thus, we must determine whether the threat of such harsh consequence alters our disposition of this case. In this respect, we are guided by the Supreme

---

7. In 1982, CETA was replaced by the Job Training Partnership Act, Pub.L. 97–300, 96 Stat. 1324 (presently codified at 29 U.S.C. § 1501 *et seq.* (1988)).

Court's decision in *United States v. Montalvo–Murillo*, 495 U.S. 711, 110 S.Ct. 2072, 109 L.Ed.2d 720 (1990). That case involved a procedural provision of the Bail Reform Act requiring that a detention hearing for criminal suspects be held upon the suspect's first appearance before a judicial officer. *Id.* 110 S.Ct. at 2075–76 (citing 18 U.S.C. 3142(f)). The appellant in the case was a criminal defendant who did not receive a detention hearing until fifteen days after his arrest and after he had appeared on two occasions before federal magistrates in two jurisdictions. *Id.* 110 S.Ct. at 2076. On appeal from a magistrate's order allowing the appellant to be released upon a $50,000 bond, the district court agreed that the appellant should have been detained, but ordered the release of the appellant on the grounds that the procedural timing requirements of section 3142(f) had not been satisfied and that pre-trial release was the appropriate remedy for violation of the statute. 713 F.Supp. 1407, 1414–15 (D.N.M.1989). This court affirmed. 876 F.2d 826, 827 (10th Cir.1989). The Supreme Court reversed, holding that the remedy for violation of the statutory procedural requirement was not the mandatory release of the aggrieved defendant. 110 S.Ct. at 2077. In so holding, the Court cited its decision in *Brock v. Pierce County*, and concluded:

> In similar manner, in this case the word "shall" in the Act's hearing time requirement does not operate to bar all authority to seek pretrial detention once the time limit has passed. Although the duty is mandatory, the sanction for breach is not loss of all later powers to act.

*Id.* 110 S.Ct. at 2078. Thus, even when significant private interests are threatened by the government's failure to comply with statutorily prescribed time requirements, the Court has refused to conclude that the government loses its authority to ultimately perform its function. In this case, while we recognize the importance of the private interests involved, we do not conclude that the NTSB loses its jurisdiction over appeals from FAA suspension or revocation orders by failing to comply with the 60–day time limit of section 1429(a).

We also note that our holding that the 60–day time limit of section 1429(a) is not jurisdictional is consistent with the overall scheme of the statute. Section 1429(a) describes the general procedures for suspending an airman certificate and provides that:

> [p]rior to ... suspending [an airman certificate] ... the Secretary of Transportation shall advise the holder thereof as to any charges or other reasons relied upon by the Secretary ... for his proposed action and, except in cases of emergency, shall provide the holder of such a certificate an opportunity to answer any charges and be heard as to why such certificate should not be ... suspended.... Any person whose certificate is affected by such an order of the Secretary of Transportation under this section may appeal the Secretary of Transportation's order to the National Transportation Safety Board and modify, or reverse the Secretary of Transportation's order if it finds that safety in air commerce or air transportation and the public interest do not require affirmation of the Secretary of Transportation's order.... The filing of an appeal with the National Transportation Safety Board shall stay the effectiveness of the Secretary of Transportation's order unless the Secretary of Transportation advises the National Transportation Safety Board that an emergency exists and safety in air commerce or air transportation requires the immediate effectiveness of his order, in which event the order shall remain effective and the National Transportation Safety Board shall finally dispose of the appeal within sixty days after being so advised by the Secretary of Transportation.

49 U.S.C.App. 1429(a). The statute thus anticipates that, in the normal case, any person whose airman certificate is suspended will be entitled to several important procedural rights, including notice of the charges underlying the suspension and opportunity to refute those charges, and an automatic stay of the suspension order pending review of the order by the NTSB.

In addition to this general class of petitioners, the statute also creates a special class of emergency order petitioners. Upon the FAA's designation of a particular case as an emergency situation, the person affected by the FAA's order loses the procedural rights to pre-deprivation notice, hearing and automatic stay of the suspension order pending appeal. This extraordinary exception, created to protect public safety, is limited by the statute, however, to sixty days. The sixty-day period thus appears to be a limit not on NTSB jurisdiction, but on the duration of the FAA's emergency designation.

Finally, we recognize that the Sixth Circuit has recently held that the NTSB's failure to comply with the 60–day time requirement in section 1429(a) does not divest the Board of continuing jurisdiction over the matter. *McCarthney v. Busey*, 947 F.2d 1302 (6th Cir.1991). That case involved appeals by seven pilots whose airman certificates were revoked by FAA emergency orders for alleged false and fraudulent entries in official records in violation of 14 C.F.R. § 61.59(a)(2). The court held that the 60–day time requirement was not jurisdictional and, alternatively, that the period had not, in fact, expired at the time the NTSB issued its order. *Id.*, 947 F.2d at 1307. The rationale for the court's conclusion that section 1429(a) is not jurisdictional was that

> [t]he general rule is that
>> [a] statutory time period is not mandatory unless it both expressly requires an agency or public official to act within a particular time period and specifies a consequence for failure to comply with the provision.

*St. Regis Mohawk Tribe, New York v. Brock*, 769 F.2d 37, 41 (2d Cir.1985), *cert. denied*, 476 U.S. 1140 [106 S.Ct. 2245, 90 L.Ed.2d 692] (1986) (quoting *Fort Worth Nat'l Corp. v. FSLIC*, 469 F.2d 47, 58 (5th Cir.1972), and citing other cases back to *French v. Edwards*, 80 U.S. (13 Wall) 506, 511 [20 L.Ed. 702] (1871)).

Petitioners have been able to point to no provision of the statute or pertinent regulation that requires the order of the ALJ to be considered final and unappeal-able if the NTSB fails to act within the 60–day period. Absent such a specific provision, we find no basis for holding that a failure of the NTSB to act within 60 days renders the ALJ decision final. *Id.* 947 F.2d at 1306–07.

Although we agree with the Sixth Circuit that the NTSB's failure to finally dispose of Petitioner's appeal within the prescribed time period does not deprive the Board of jurisdiction, we decline to adopt the strictly formulated rule applied in *McCarthney*. Both the United States Supreme Court and this court have historically declined to adopt the rule espoused by the Sixth Circuit. *See Brock v. Pierce County*, 476 U.S. 253, 259, 106 S.Ct. 1834, 1838, 90 L.Ed.2d 248 (1986) (noting that the Court had "never expressly adopted" the *St. Regis Mohawk Tribe* rule relied on by the Sixth Circuit); *Twin Pines Coal Co. v. Unites States Dept. of Labor*, 854 F.2d 1212, 1216 (10th Cir.1988) (citing *Pierce County* and declining to adopt the *St. Regis Mohawk Tribe* rule in holding that a statutory time period included in the Federal Mine Safety & Health Act was not jurisdictional). Similarly, we decline in this case to adopt the rule, relying instead on the *Pierce County* test.

## IV. Conclusion

We have concluded that the NTSB's order affirming the FAA's suspension of Petitioner's airman certificate was supported by substantial evidence. Additionally, we hold that the NTSB's failure to finally dispose of Petitioner's appeal within the statutorily prescribed time limit does not divest the Board of jurisdiction to complete its appeals process. Therefore, we affirm the NTSB's July 24 order.