**GRAINBELT CORPORATION and Farmrail Corporation, Petitioners**

v.

**SURFACE TRANSPORTATION BOARD and United States of America, Respondents**

**Burlington Northern Santa Fe Corporation, et al., Intervenors.**

**No. 96–1006.**

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 10, 1997.

Decided April 4, 1997.

Eric M. Hocky, argued the cause for petitioners, with whom William P. Quinn and Mary Anne Taufen, Westchester, PA, were on the briefs.

Louis Mackall, V, Attorney, Surface Transportation Board, argued the cause for respondents, with whom Henri F. Rush, General Counsel, Joel I. Klein, Acting Assistant Attorney General, U.S. Department of Justice, Robert B. Nicholson and John P. Fonte, Attorneys, Washington, DC, were on the brief.

Richard E. Weicher, Schaumburg, IL, Michael E. Roper, Fort Worth, TX, Betty Jo Christian, Samuel M. Sipe, Jr., David H. Coburn, Erika Z. Jones, Roy T. Englert, Jr. and Adrian L. Steel, Jr., Washington, DC, were on the joint brief for intervenors Burlington Northern, Inc., et al. Timothy M. Walsh and Kathryn A. Kusske, Washington, DC, entered appearances.

Before: WILLIAMS, GINSBURG and ROGERS, Circuit Judges.

Opinion of the Court by Circuit Judge ROGERS.

ROGERS, Circuit Judge:

In this petition for review of an order of the Interstate Commerce Commission approving the control and merger application of Burlington Northern Railroad ("BN") and Atchison, Topeka and Santa Fe Railway ("Santa Fe"), and their respective affiliated companies, petitioners Grainbelt Corporation and Farmrail Corporation challenge the Commission's denial of their request that, as a condition of the merger, Farmrail be granted a specific access right to a rail carrier that would enable it to compete with the merged lines. Petitioners contend that the Commission's finding that the merger will not significantly reduce rail competition in the region is unsupported by the evidence, and that, in light of the potential adverse effect of the merger on competition, the Commission was obliged to grant the requested protective condition because it would not detract from the overall benefits of the merger. Concluding that the Commission's factual findings are supported by substantial evidence in the record, and that it was reasonable for the Commission to deny petitioners' request for imposition of the protective condition and to decline to adjust the pre-existing contractual

arrangement of the parties, we deny the petition.

## I.

■ Under the Interstate Commerce Act, 49 U.S.C. § 11343 *et seq.*, the Interstate Commerce Commission is to "approve and authorize" a rail carrier transaction when it finds the transaction "consistent with the public interest." [1] 49 U.S.C. § 11344(c). In assessing the impact of a railroad merger on the public interest, the Commission's well-established practice is to weigh the prospective gains in operating efficiency and marketing capability realized through consolidation against any consequent reduction in competition or in the provision of essential services. 49 C.F.R. § 1180.1(c); *Southern Pacific Transp. Co. v. ICC*, 736 F.2d 708, 717 (D.C.Cir.1984).

■ The Commission also has broad authority to impose protective conditions to govern mergers. 49 U.S.C. § 11344(c); *see Lamoille Valley R.R. v. ICC*, 711 F.2d 295, 302 & n. 8 (D.C.Cir.1983). Yet, the Commission has long maintained a policy of refraining from burdening mergers with conditions unless they are necessary either to ameliorate the anti-competitive impact of a merger or to protect essential services. *See Lamoille Valley R.R.*, 711 F.2d at 302 n. 8; *see also Railroad Consolidation Procedures*, 363 I.C.C. 784, 788–89 (1981) (codified at 49 C.F.R. § 1180.1(d)). Consequently, the Commission will impose conditions only when a transaction threatens harm to the public interest, the conditions are operationally feasible, they would ameliorate or eliminate the harm, and they would result in greater

benefit to the public than detriment to the transaction. *Union Pacific—Control—Missouri Pacific; Western Pacific*, 366 I.C.C. 462, 562–65 (1982).

On October 13, 1994, BN and Santa Fe filed a merger application proposing to create an integrated rail system of approximately 35,000 miles in the Western United States. The Commission granted the application with certain conditions, including two designed to address petitioners' interests.[2] On reconsideration, the Commission declined to impose additional conditions requested by petitioners.[3]

Grainbelt and Farmrail are short line rail carriers that transport wheat. Both carriers are wholly owned subsidiaries of Farmrail System, Inc., which operates a network of rail lines in western Oklahoma.[4] Under a lease from BN, Grainbelt operates 178 miles of rail lines extending in a generally north-south direction between Enid and Frederick, Oklahoma, and has incidental overhead trackage rights over 59 miles of a BN line between Quanah, Texas, and Snyder, Oklahoma. Under a lease from the Oklahoma Department of Transportation, Farmrail operates 187 miles of rail line formerly owned by Santa Fe; Farmrail's lines run east and west from Hydro to Erick, and north and south from Thomas to Elmer, all in Oklahoma. Grainbelt and Farmrail connect only at Clinton, which is approximately the midpoint of their lines.

Through their connections with Class I railroads,[5] Grainbelt and Farmrail provide wheat shippers in western Oklahoma with rail access to the Texas Gulf ports. Prior to

---

1. The ICC Termination Act of 1995, Pub.L. No. 104–88, 109 Stat. 803 (Dec. 29, 1995), which abolished the Interstate Commerce Commission and transferred some of its functions to the Surface Transportation Board, generally substituted the STB for the ICC in 28 U.S.C. § 2321 and § 2342. However, § 204(c)(1) of the Act provides that with respect to all suits commenced against the ICC before the effective date of the ICCTA, January 1, 1996, "proceedings shall be had, appeals taken, and judgments rendered in the same manner and with the same effect as if this Act had not been enacted."

2. Burlington Northern Inc. and Burlington Northern R.R. Co.—Control and Merger—Santa

Fe Pacific Corp. and The Atchison, Topeka and Santa Fe Ry. Co., Docket No. 32549, Decision No. 38 (August 16, 1995).

3. Burlington Northern Inc. and Burlington Northern R.R. Co.—Control and Merger—Santa Fe Pacific Corp. and The Atchison, Topeka and Santa Fe Ry. Co., Docket No. 32549, Decision No. 43 (November 13, 1995).

4. See Appendix (map).

5. A Class I railroad, as defined by the Commission, has annual revenues in excess of $250 million. *See* 49 C.F.R. § 1201.1–1(a) (1992).

the merger, both Grainbelt and Farmrail had, directly or indirectly, three Class I rail connections: BN, Santa Fe, and Union Pacific Railroad Company and Missouri Pacific Railroad Company (collectively "Union Pacific"). Grainbelt's connections were at Enid, Snyder, Quanah, and Frederick. At Enid, Grainbelt connected directly with BN and indirectly with Santa Fe and Union Pacific (by virtue of an agreement under which BN transferred freight between Grainbelt and the two railways). At Snyder and Quanah, Grainbelt connected directly with BN. At Frederick, Grainbelt connected with the Wichita, Tillman & Jackson Railway Company ("WT&J"), a Union Pacific spinoff which itself connected with Union Pacific at Wichita Falls, Texas. Farmrail's connections were at Clinton and Altus. At Clinton, Farmrail connected with Grainbelt, which, as stated, connected directly with BN and indirectly with Santa Fe and Union Pacific at Enid. At Altus, Farmrail connected with BN and WT&J, the latter of which connected to Union Pacific at Wichita Falls.

Unlike Farmrail, Grainbelt is subject to a "competitive block" with BN. Under the terms of the lease agreement between Grainbelt and BN, Grainbelt must pay a substantial additional rental payment, beyond the base rent, whenever Grainbelt handles shipments in conjunction with a carrier other than BN if the shipment is to or from points served by BN. This arrangement is referred to as a "competitive block" because it generally makes routes between Grainbelt and points on the lines of other carriers uneconomical when served by BN as well.

In the Commission's initial proceeding reviewing the proposed merger, Grainbelt filed a request for protective conditions to reduce the anti-competitive effects of the merger and to offset Farmrail System's anticipated loss of revenue as a result of the merger. First, concerned that BN, despite having made representations to the contrary, might attempt to extend the reach of its blocking provision to points served by Santa Fe, Grainbelt asked the Commission to remove or modify the blocking provision from the lease agreement with BN. Second, Grainbelt requested the Commission to amend its track-age rights agreement with BN to permit Grainbelt to interchange with the Southern Pacific Transportation Company ("Southern Pacific") at Quanah, Texas, and to serve local traffic and to interchange with Farmrail at Altus. The imposition of these latter conditions, Grainbelt contended, would enable Farmrail and Grainbelt to offer the western Oklahoma shipping public competitive and more efficient rail service, thus mitigating the anti-competitive effects of the proposed merger.

In approving the merger, the Commission imposed a condition requiring the applicants to adhere to their representations not to attempt to increase the scope of the Grainbelt–BN blocking provision to points served by Santa Fe. It declined, however, to remove the blocking provision altogether, explaining that the provision stemmed from a pre-existing agreement and the Commission does not "impose conditions merely to rectify pre-existing problems." The Commission also imposed Grainbelt's requested condition that it be permitted to interchange with Southern Pacific at Quanah, Texas. This condition, the Commission explained, would provide Grainbelt with a competitive alternative to the independent Santa Fe connection that Grainbelt lost as a result of the merger. The Commission declined, however, to grant Grainbelt's request that its trackage rights agreement with BN be modified to permit it to interchange with local traffic and Farmrail at Altus. The Commission explained that, although the interchange might lead to greater efficiency and an expanded traffic base for Grainbelt, Grainbelt could not interchange traffic at Altus before the merger, and thus the relief sought was not necessary to ameliorate any harm caused by the merger.

Farmrail, in seeking on reconsideration essentially the same forms of relief that were denied to Grainbelt, requested access to Southern Pacific at Quanah through a connection with Grainbelt at Altus. Farmrail contended that the Commission could not properly deny Farmrail this access because, similar to its impact on Grainbelt, the merger would eliminate the only effective competition in the region served by Farmrail.

Farmrail maintained that, although it could theoretically connect with Union Pacific by means of another short line carrier, the fact that pre-merger less than 1% of Farmrail's traffic interlined with Union Pacific provided "conclusive proof" that Union Pacific was not a viable competitive alternative for Farmrail shipping traffic. Farmrail's utilization of the Grainbelt–Southern Pacific connection at Quanah would provide, in Farmrail's view, the only feasible post-merger alternative to BN, allowing for no more than a replacement of the pre-merger Grainbelt–Santa Fe alternative.

The Commission denied the petition for reconsideration. First, it explained its differential treatment of Grainbelt and Farmrail.[6] Prior to the merger, the Commission noted, both Grainbelt and Farmrail had, directly or indirectly, three Class I rail connections, and, absent any protective conditions, the merger would have effectively reduced the number of connections to two. The Commission imposed a condition allowing Grainbelt, but not Farmrail, to interchange with Southern Pacific at Quanah because the blocking provision placed an artificial restriction on one of Grainbelt's two remaining alternatives; Farmrail, by contrast, would be left with two unrestricted connections. Repeating its view expressed in the merger approval that "[t]wo independent railroads ... can provide strong, effective competition provided that, among other things, neither is subject to any artificial restrictions," the Commission declined to impose the condition on Farmrail's behalf.

Second, the Commission addressed Farmrail's contention that Union Pacific was not a viable competitive alternative. Noting that the primary focus of its analysis of the competitive impact of the merger was on harm to shippers, rather than to rail carriers, the Commission stated that the relative lack of traffic interchange between Farmrail and Union Pacific was not indicative of whether Union Pacific was a viable competitive alternative for wheat shippers in the region. The Commission explained:

Grain moves from farm to the railhead by truck.... Given the proximity of the two [Union Pacific] feeder lines to the farmers in this area, it is no surprise that [Farmrail] and [Grainbelt] have not interchanged much traffic with [Union Pacific]. Farmers that wish to use [Union Pacific] for the line haul can simply truck their products to the [Union Pacific] feeder lines rather than to [Farmrail] or [Grainbelt].

Whether used or not, the presence of the Union Pacific connection, the Commission added, provided an incentive for the merged BN/Santa Fe carrier to offer Farmrail reasonable conditions for competitive joint movements.

Finally, the Commission noted Farmrail's ability to take advantage of the protective condition permitting Grainbelt to interchange with Southern Pacific at Quanah. As a result of this affirmative relief to Grainbelt, the Commission explained, Farmrail may interchange traffic with Grainbelt at Clinton for movement to Southern Pacific. Acknowledging that this route would be "arguably more circuitous for grain bound to the Gulf" than would be the case if Farmrail could interchange with Grainbelt at Altus, the Commission stated that "it is much less so than the [Farmrail]/Santa Fe route that [Farmrail] claims it has lost the benefit of through the merger." The Commission noted that Farmrail did not have the Altus connection before the merger, and had not made a case for the grant of such relief.

## II.

█ The Commission has "extraordinarily broad discretion" in deciding whether to impose protective conditions in the context of railroad consolidations. *Southern Pacific Transp. Co. v. ICC,* 736 F.2d 708, 721 (D.C.Cir.1984) (per curiam) (citing 49 U.S.C. § 11344(c)). Affording "great deference" to the Commission's selection of such conditions, *id.,* the court will deny a petition for review so long as the Commission's decision

---

**6.** The Commission noted that although the party seeking reconsideration was not the party that sought the relief that was partially denied in the decision approving the merger, the Commission

would overlook this fact and consider the petition because Farmrail is essentially the "alter ego" of Grainbelt.

is supported by substantial evidence in the record and was reached by reasoned decision-making. 5 U.S.C. § 706(2)(A) & (E); *see also Lamoille Valley R.R.,* 711 F.2d at 307. "[T]he Commission's factual findings must be supported by enough evidence 'to justify ... a refusal to direct a verdict' the other way in a case tried to a jury," *Lamoille Valley,* 711 F.2d at 307 (quoting *Illinois Cent. R.R. v. Norfolk & W. Ry.,* 385 U.S. 57, 66, 87 S.Ct. 255, 260, 17 L.Ed.2d 162 (1966)), and "when the facts are uncertain, the agency will 'so state and go on to identify the considerations [it] found persuasive.'" *Id.* (quoting *Industrial Union Dept., AFL–CIO v. Hodgson,* 499 F.2d 467, 476 (D.C.Cir. 1974)). With regard to its decision-making process, moreover, "the Commission must 'consider[ ] the relevant factors and articulate[ ] a rational connection between the facts found and the choice made.'" *Id.* (quoting *Baltimore Gas and Elec. Co. v. Natural Resources Defense Council,* 462 U.S. 87, 88, 103 S.Ct. 2246, 2248, 76 L.Ed.2d 437 (1983)).

In appealing the Commission's denial of the requested condition, petitioners initially contend that the Commission's conclusion that the merger would not significantly lessen transportation competition in the region was unsupported by the evidence.[7] They base this contention on two grounds, neither of which has merit.

■ First, petitioners contend that the Commission's finding that Union Pacific provides a viable competitive option for the wheat shippers in the region was unsupported by the record. They stress both their proffer of evidence that Union Pacific has generated less than 1% of the traffic originated by Farmrail and the lack of any evidence that Union Pacific is willing, not simply able, to provide the empty grain cars and competitive rates necessary to compete in the region. Yet, petitioners do not dispute that Union Pacific transfers grain, and that two of its feeder lines can be reached by farmers in the area by truck. Absent any contrary evidence, these facts support the Commission's reasoning that the relative lack of traffic interchange between Farmrail and Union Pacific in no way indicates that Union Pacific is unable or unwilling to provide grain transport service to farmers in western Oklahoma. Moreover, in light of Farmrail's access to Union Pacific by means of a short line connection with WT&J at Altus, it was reasonable for the Commission to conclude that "[w]hether used or not, the presence of this [Union Pacific] shortline connection provides BN/Santa Fe an incentive to offer Farmrail reasonable conditions for competitive joint movements."

■ Second, petitioners challenge the Commission's assumption that Farmrail could viably access Southern Pacific by interchanging with Grainbelt at Clinton. Acknowledging that it was theoretically possible for Farmrail to use this route, petitioners maintain that the Commission, which "recognized [the route's] inefficiency," had no evidence before it to determine whether this option would be economically feasible. Yet, prior to the merger, Farmrail transported its grain on Santa Fe through a substantially more circuitous route to the Gulf than the route post-merger on Southern Pacific. As the Surface Transportation Board points out, "[b]efore the merger, the grain moved north over Farmrail for interchange at Clinton, then moved over Grainbelt's lines north all the way to Enid, and then south again to the Gulf. Now, the grain can move north a much shorter distance to Clinton and then proceed south over Grainbelt through Quanah to the Gulf." Notwithstanding petitioners' contention that special rates and marketing efforts were necessary to make the Santa Fe route feasible, absent evidence of any barrier to similarly efficient arrangements with Southern Pacific, there was sufficient evidence for the Commission to infer that Farmrail could

---

7. Petitioners never directly challenged the Commission's finding that a 3–2 reduction in railroads is unproblematic if the remaining two rail carriers are independent and free of any artificial restrictions. Rather, petitioner focused on the supposedly sluggish quality of the remaining competition. Moreover, as we note below, the Commission did not need to reply on its premise about the impact of a 3–2 reduction in access because Farmrail (to which Grainbelt is both affiliated and physically connected) could still connect with three class I carriers after the merger.

take advantage of Grainbelt's connection to Southern Pacific.

That the newly available route through Clinton was not the most direct or efficient route to Southern Pacific does not render the Commission's decision arbitrary and capricious. It is true, as petitioners contend, that in *Lamoille Valley*, 711 F.2d at 321 n. 52, the court stated, in discussing the need for protective conditions, that "[u]nless the difference in efficiency is minor, the public interest supports preserving the more efficient route." Yet there, the petitioners sought a protective condition to preserve a pre-existing efficient situation that served the public interest. Here, petitioners seek a protective condition to create an efficient route, the public interest implications of which have not been substantiated. Moreover, the prohibition against traffic interchange between Farmrail and Grainbelt at Altus resulted from a contractual agreement negotiated by Grainbelt and BN. Under the circumstances it was reasonable for the Commission to decline to impose a condition requiring the most efficient alternative available where to do so would involve modifying trackage rights under a pre-existing contractual agreement.

Petitioners also maintain that the Commission had a duty to ameliorate the reduction of competitive outlets for Farmrail's traffic because it was possible to do so without detracting from the overall benefits of the merger. They contend that permitting the interchange would not affect the one billion dollar in gains that will accrue to BN/Santa Fe as a result of the merger. They rely on *Lamoille Valley*, 711 F.2d at 302, for the proposition that once a party demonstrates that a transaction will result in a reduction of competition, the Commission must determine the desirability of proposed conditions by balancing their costs and benefits. But petitioners have provided no evidence of a reduction in competition. Based on its findings that the Union Pacific and the merged BN/Santa Fe lines will provide two independent Class I railroad connections for Farmrail, and that the Southern Pacific line will be available to Farmrail as an alternative to the Santa Fe connection lost as a result of the merger, the Commission reasonably concluded the merger would not have an anti-competitive effect or cause harm to essential services. Thus, the Commission was under no further obligation to engage in a cost-benefit analysis of the requested condition.

Accordingly, we deny the petition.

## *APPENDIX*

### EXHIBIT I

Enid
Thomas
Hydro
Clinton
Snyder
Altus
Elmer
Frederick
Quanah

Appendix A1 to Petitioners Brief